NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-4399-13T2

AMERICAN CIVIL LIBERTIES UNION
OF NEW JERSEY, UNITARIAN
UNIVERSALIST LEGISLATIVE MINISTRY
OF NEW JERSEY, GLORIA SCHOR
ANDERSEN, PENNY POSTEL, and
WILLIAM FLYNN,

     Appellants,

v.

ROCHELLE HENDRICKS, Secretary of
Higher Education for the State of
New Jersey, in her official
capacity; and ANDREW P.
SIDAMON-ERISTOFF, State Treasurer,
State of New Jersey, in his
official capacity,

     Respondents.

**APPROVED FOR PUBLICATION**

**May 26, 2016**

**APPELLATE DIVISION**

Argued April 11, 2016 — Decided May 26, 2016

Before Judges Sabatino, Accurso and Suter.

On appeal from New Jersey Department of Education, Office of the Secretary of Higher Education.

Edward L. Barocas (American Civil Liberties Union of New Jersey Foundation) argued the cause for appellants (Barry, Corrado & Grassi, P.C.; Lenora Lapidus (American Civil Liberties Union Women's Rights Project); Galen Sherwin (American Civil Liberties Union - Women's Rights Project) of the New York Bar, admitted pro hac vice; Daniel Mach (American Civil Liberties Union Program on

Freedom of Religion and Belief) of the District of Columbia bar, admitted pro hac vice; Ayesha Khan (Americans United for Separation of Church and State) of the District of Columbia bar, admitted pro hac vice, and Alex Luchenitser (Americans United for Separation of Church and State) of the District of Columbia bar, admitted pro hac vice, attorneys; Mr. Barocas, Jeanne M. LoCicero, Frank L. Corrado, Ms. Lapidus, Ms. Sherwin, Mr. Mach, Ms. Khan, Mr. Luchenitser, on the briefs).

Stuart M. Feinblatt, Assistant Attorney General, argued the cause for respondents (Robert Lougy, Acting Attorney General, attorney; Mr. Feinblatt, of counsel and on the brief; Jennifer J. McGruther, Deputy Attorney General, and Laura M. Console, Deputy Attorney General, on the brief).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

Appellants, the American Civil Liberties Union of New Jersey ("ACLU-NJ"), the Unitarian Universalist Legislative Ministry of New Jersey ("UULM-NJ"), and three individuals challenge the Department of Higher Education's award of public grants to two sectarian institutions of higher education. Specifically, appellants contest two grants for capital improvements totaling over $10 million the Department awarded to Beth Medrash Govoha ("the Yeshiva"), and three grants totaling $645,323 it awarded to Princeton Theological Seminary ("the Seminary").

Appellants contend the grants violate Article I, Paragraph 3 of the New Jersey Constitution because the recipients will use the grant funds to support religious instruction, including the preparation of candidates for ministries respectively in the Jewish and Christian faiths. Appellants further contend that the grants violate other provisions in the State Constitution. Lastly, they argue the grants violate the Law Against Discrimination ("LAD"), N.J.S.A. 10:5-1 to -49, because the recipient institutions engage in gender-based or religion-based discriminatory practices.

As we explain in this opinion, the constitutional analysis under Article I, Paragraph 3 is controlled by the New Jersey Supreme Court's opinion in Resnick v. East Brunswick Township Board of Education, 77 N.J. 88 (1978) (construing Article I, Paragraph 3 to bar public schools from allowing religious organizations to use their school facilities in the evenings and on weekends for religious instruction unless the users fully reimburse the public for the costs of providing such access). Applying that binding precedent here, we conclude that Resnick compels the invalidation of these grants of public funds to the Yeshiva and the Seminary.

In doing so, we acknowledge that the intended meaning of Article I, Paragraph 3 of the Constitution — a provision

included in our State's first Constitution in 1776 and readopted in the 1844 and 1947 Constitutions — is not entirely clear. We also are mindful that the Court did not discuss the provision's history at length in <u>Resnick</u>. Nevertheless, we do no more than acknowledge the debatable lineage of the provision, leaving it to the Supreme Court to consider, if it so chooses, whether the arguments presented by the parties as to the meaning and history of the clause warrant a reexamination of <u>Resnick</u>.

I.

<u>The Bond Act and the Grant Process</u>

On August 7, 2012, the Governor signed into law the "Building Our Future Bond Act" ("GO Bond Act"), <u>L.</u> 2012, <u>c.</u> 41, a measure dedicated to capital improvement projects for New Jersey institutions of higher education. Pursuant to that initiative, a $750 million public referendum in November 2012 authorized the State to issue and direct bond proceeds for capital improvements to the higher education sectors.

The Governor thereafter authorized the Secretary of the Department of Higher Education to promulgate rules and approve grants that would make use of GO Bond Act funds, along with four other State-supported bond programs administered by the New Jersey Educational Facilities Authority ("NJEFA"). The State's commitment to capital investment in higher education through

these initiatives totaled $1,316,905,000. That amount was comprised of $750 million under the GO Bond Act Fund; $191,905,000 under the Higher Education Capital Improvement Fund ("CIF"); $220 million under the Higher Education Facilities Trust Fund ("HEFT"); $55 million under the Higher Education Technology Infrastructure Fund ("HETI"); and $100 million under the Higher Education Equipment Leasing Fund ("ELF").[1]

A "Solicitation for Grant Applications" for these programs was issued by the Secretary for what was known as the "Spring 2013 Cycle." The Solicitation explained that GO Bond Act funds would provide grants for projects to construct and equip academic facilities, and would be allocated by sector as follows: $300 million for public research universities; $247.5 million for state colleges and universities; $150 million for county colleges; and $52.5 million for private nonprofit institutions with endowments less than $1 billion. Institutions receiving GO Bond Act funds would be required to provide matching funds equal to twenty-five percent of the cost of the proposed project. See N.J.A.C. 9A:18-1.3(c).

---

[1] Because the issues raised in this appeal involve grants made only under the GO Bond Act and the HETI Act, those are the only programs that we discuss in any detail.

The Solicitation announced that applications for GO Bond Act funds would be reviewed and compared with others within each sector pursuant to the following criteria:

1.  the advancement of student education in the State of New Jersey;

2.  the improvement and expansion of educational opportunities for students;

3.  the promotion of academic research excellence, workforce readiness and the enhancement of the State's academic and economic competitiveness and prosperity by assisting in the production of a highly skilled workforce;

4.  the promotion of innovation and improvement in the delivery of higher education;

5.  the advancement of study at all levels in science, technology, engineering and mathematics education;

6.  consistency with the institution's educational mission;

7.  consistency with the institution's long-range facilities plan;

8.  the cost-effectiveness of the Project;

9.  consistency of the Project with the State's goals and priorities for development and redevelopment, including the promotion of industry clusters, job and business opportunities in areas designated by the State for growth, transportation choice and efficient mobility of goods and people, and promotion of access to opportunity for all New Jersey residents;

A-4399-13T2

> 10. the demonstrated commitment of the institution over the past ten years to appropriate maintenance of facilities previously funded by the State of New Jersey grant programs; and
>
> 11. serving the best interests of higher education in the State as a whole.

These criteria mirror those enumerated under N.J.A.C. 9A:18-1.6(b).

The Solicitation explained that HETI funds were available to public or private nonprofit institutions of higher education eligible to receive State aid. Grants would be awarded for technology infrastructure projects that "advance the institution toward the next level in establishing integrated voice, video and data networks." See N.J.A.C. 9A:13-1.3(a)(4). Applications for HETI funds would be reviewed under the same criteria as those considered under the GO Bond Act, with the exception that "the demonstrated commitment of the institution over the past ten years to appropriate maintenance of facilities previously funded by the State of New Jersey grant programs" was not a factor. See N.J.A.C. 9A:13-1.5(b). Institutions receiving HETI funds would be required to provide matching funds equal to the amount of the grant requested. See N.J.A.C. 9A:13-1.3(a)(6).

In response to the Solicitation, forty-six higher education institutions submitted applications proposing more than 250 capital improvement projects totaling $2.1 billion. On April

29, 2013, the Governor announced that the Secretary had transmitted to the Legislature a list of 176 projects that were recommended for awards. Because the Legislature failed to take action to preclude the grants within the prescribed time limits, the list was deemed approved and authorized. See N.J.A.C. 9A:13-1.6(c) (as to HETI); N.J.A.C. 9A:18-1.7(d) (as to GO Bond Act).

Beth Medrash Govoha ("the Yeshiva")

The Yeshiva is a private institution of higher education located in Lakewood that specializes in advanced Talmudic scholarship. According to its grant applications, the Yeshiva "is an independent institution rooted in Jewish tradition. It has no formal affiliation to any hierarchical religious organization."

The Yeshiva has over 6000 undergraduate and graduate students. According to its applications, the Yeshiva "represents 59% of Lakewood's families and 74% of Lakewood's married couples." The Yeshiva asserts that its emergence in the Lakewood community and the jobs it has provided have contributed significantly to the area's economic and demographic growth over the last twenty years.

The Yeshiva offers an undergraduate program culminating in a Bachelor of Talmudic Studies degree. The twelve required

courses in the undergraduate curriculum all involve the study of the Talmud. The Yeshiva describes the Talmud as "a broad compendium of scholarship that draws on knowledge from a wide array of sources and disciplines, among which are references to religious texts such as the Bible."

The Yeshiva acknowledged that its curriculum includes "religious study." Its grant applications defined the term as "the study of religious beliefs, behaviors, texts, [and] institutions" because "portions of the curriculum may utilize texts with religious origins." Undergraduates at the Yeshiva may take elective courses in Ethics and Hebrew Language and Literature. The Yeshiva offers graduate programs conferring a Master of Talmudic Studies, a Graduate Talmudic Diploma, or an Advanced Graduate Talmudic Diploma. There is also what the Yeshiva characterizes as a "small program available to advanced students" that leads to ordination as a rabbi. According to the Yeshiva, fewer than 5% of its enrolled students participate in its ordination program.

Admission to the Yeshiva is limited to qualified men, regardless of their religious affiliation, national or ethnic origin, age, race, color, or disability. The faculty are all of the Jewish faith, although that is not a formal requirement. The Yeshiva staff are not all of the Jewish faith, however, and

A-4399-13T2

the Yeshiva's employment policy asserts that it "does not discriminate on the basis of race, color, creed, religion, gender, pregnancy, marital status, age, national origin, ethnicity, ancestry, handicap or disability, atypical hereditary cellular or blood trait, or service in the Armed Forces of the United States or status as a veteran of the Vietnam Era."

The Secretary recommended awarding two grants to the Yeshiva from GO Bond Act funds totaling $10,635,747. The first grant was for the construction of a new library and research center that would also house the Department of Hebrew Studies, the Department of Adult and Continuing Education, internship advisors, career and academic counselors, and a writing resource center. The second grant was for the renovation of an existing building to create fourteen new classrooms, a reference library, a computer room, faculty offices, and academic support space.

In July 2013, the Secretary formally notified the Yeshiva that its applications for grant funding had been approved. A corresponding grant agreement was ultimately executed between the Yeshiva and the NJEFA in June 2015 while this case was pending.

Princeton Theological Seminary ("the Seminary")

The Seminary is a private institution of higher education in Princeton, having what it describes as "an historical and

continuing relationship with the Presbyterian Church (USA)." The Seminary's stated mission is to "prepare[] women and men to serve Jesus Christ in ministries marked by faith, integrity, scholarship, competence, compassion, and joy, equipping them for leadership worldwide in congregations and the larger church, in classrooms and the academy, and in the public arena." According to its Mission Statement, the Seminary

> stands within the Reformed tradition, affirming the sovereignty of the triune God over all creation, the gospel of Jesus Christ as God's saving word for all people, the renewing power of the word and Spirit in all of life, and the unity of Christ's servant church throughout the world. This tradition shapes the instruction, research, practical training, and continuing education provided by the Seminary, as well as the theological scholarship it promotes.

As a professional and graduate school, the Seminary offers degrees in Master of Divinity; Master of Arts (Christian Education); Master of Theology; and Doctor of Philosophy (Biblical Studies, History and Ecumenics, Theology, Practical Theology, or Religion and Society). The school also offers continuing education programs through conferences, initiatives, institutes, summer courses, and inter-institutional agreements.

The Seminary acknowledges that "[r]eligious instruction is a mandatory component of [its] Master of Divinity program; students in the other Masters programs and the Ph.D. program can

arrange their course work and may opt out of religious instruction altogether." A review of the Seminary's course catalog reveals comparatively few offerings that do not entail study of the Bible; religious literature; hymns; art or poems; religious philosophy; spirituality; the ecumenical movement; Christian ethics; evangelism; pastoral care; ministry; or denominational doctrines.

According to the Seminary, it "does not discriminate on the basis of race, color, ancestry, sex, age, marital status, national or ethnic origin, sexual orientation, gender identity, or disability in its admissions policies." As to religion, all degree students and faculty at the Seminary are expected to be of the Christian faith. However, staff and participants in non-degree programs at the Seminary are not required to be Christians.

The Secretary recommended awarding the Seminary three grants from HETI funds totaling $645,323. The proposed projects would (1) upgrade the IT infrastructure of the Luce Library to allow for expanded historical and theological research; (2) install technology in a training room to allow for on-site and distance training of students and staff; and (3) equip a conference room with multimedia functionality to expand online education and strengthen interaction with other universities.

The Seminary indicated in its grant application that the Luce Library is open to any member of the public, whether or not he or she is affiliated with the Seminary. Such persons may access the library's collections for educational, religious, historical, or other purposes. According to the Seminary, the enhancement of the library's IT infrastructure would "make available sizeable portions of the Library collection in digital form to users located anywhere in the world via the internet." The Seminary planned to use the proposed corporate-style computer training room to train employees on commercial software programs such as Microsoft applications, although the room potentially could be used for software programs in both religious instruction and religious study. The upgrades to the "Cooper" conference room were intended "to facilitate remote learning as part of [the Seminary's] continuing education programming, which includes religious instruction and religious study . . . as well as non-religious subjects."[2]

In July 2013, the Secretary notified the Seminary that its application for grant funding had been approved. A related grant agreement was executed between the Seminary and the NJEFA in June 2015.

---

[2] The State asserts in its brief that the Seminary withdrew its application to upgrade the conference room after it had been approved, and only pursued its other two projects.

<u>Other Grant Recipients</u>

The record indicates that several other higher education institutions with religious affiliations received grants from the Secretary as part of the 2013 Solicitation, including approximately $11.7 million to Seton Hall University, $2.8 million to St. Peter's University, and $2.4 million to the College of St. Elizabeth. Appellants have not challenged those other grants. Their counsel acknowledged at oral argument that the constitutional analysis as to those institutions might differ from the analysis of the present case, which solely concerns the Yeshiva and the Seminary.

<u>This Litigation</u>

The ACLU-NJ, UULM-NJ, and Gloria Schor Andersen filed in the Chancery Division a verified complaint for injunctive and declaratory relief in June 2013, along with a request for a temporary restraining order in July 2013, against the Secretary and the State Treasurer. The complaint sought a declaration that the State's grants to the Yeshiva and the Seminary, which had been approved by the Secretary and were then pending before the Legislature, violated Article I, Paragraph 3 and Paragraph 4 (what is known as the State "Establishment Clause"), and Article VIII, Section 3, Paragraph 3 (what is known as the "Public

A-4399-13T2

Purpose Clause") of the New Jersey Constitution, as well as the LAD. No federal claims were asserted.

The complaint sought to enjoin defendants from issuing any check or otherwise providing the challenged funding to the grant recipients. The complaint did not name the Yeshiva or the Seminary as co-defendants, and they have not sought to intervene in this matter.[3] The State denied that the grants violated the New Jersey Constitution or the LAD.[4]

---

[3] At oral argument on the appeal, counsel represented that the Yeshiva and the Seminary are aware of this challenge to their respective grants, and have nonetheless chosen not to seek to intervene. All counsel agree that the recipients are not indispensable parties because the funds have not been disbursed, and the Attorney General as counsel to the Secretary and State Treasurer is advocating the propriety of the grants consistent with the interests of the Yeshiva and the Seminary. See R. 4:28-1(a).

[4] In defense to the LAD claim, the State relies on the LAD's religious exemption in N.J.S.A. 10:5-5(l) ("Nothing herein contained shall be construed to include or apply to . . . any educational facility operated or maintained by a bona fide religious or sectarian institution[.]"). Appellants, meanwhile, contend that the religious exemption is unavailing to authorize grants of public funds to private institutions that practice discrimination, pointing to footnote seven of the New Jersey Supreme Court's opinion in Dale v. Boy Scouts of America, 160 N.J. 562, 593 n.7 (1999), rev'd on other grounds, 530 U.S. 640, 120 S. Ct. 2446, 147 L. Ed. 2d 554 (2000), which observes that "New Jersey governmental entities are . . . bound by the LAD," and that "[t]heir sponsorship of, or conferring of special benefits on, an organization that practices discrimination would be prohibited." We do not reach this statutory issue of first impression because we nullify the grants in this case on another legal basis.

In July 2013, the trial court entered a consent order memorializing the parties' agreement that appellants would withdraw their request for a temporary restraining order in consideration for the State's promise to provide appellants' counsel with fourteen days' advance written notice prior to disbursing any funds under the challenged grants. Appellants thereafter filed an amended verified complaint adding Penny Postel and William Flynn as plaintiffs.

Subsequently, the trial court transferred this dispute to the jurisdiction of this court pursuant to Rule 2:2-3(a)(2). During the briefing stages of this transferred appeal, a panel of this court denied appellants' motion to remand this matter for additional fact-finding to explore more fully certain details of the grant review process and the programs and activities at the two recipient institutions. Meanwhile, as was confirmed at oral argument, the disbursement of the grant funds continues to be held in abeyance.[5]

---

[5] It has come to our attention that the Secretary had issued another solicitation that closed in January 2016, which appears to be essentially identical to the content of the Spring 2013 Solicitation. The 2016 solicitation is not before us.

A-4399-13T2

As their primary argument, appellants contend that the GO Bond and HETI grants violate Article I, Paragraph 3 of the New Jersey Constitution because the funds will be used to support the "ministries" of the Yeshiva and the Seminary. They assert that both the Yeshiva and the Seminary are, fundamentally, religious schools because they train ministers of their particular sects, and provide religious instruction to all degree students. They contend that if properly construed and applied, Article I, Paragraph 3 prohibits the use of New Jersey tax revenues for the maintenance of a religious group, regardless of whether such subsidies are provided on an equal basis to other organizations. To support that contention, they rely on the Supreme Court's decision in Resnick, supra, 77 N.J. 88, as well as the history of Article I, Paragraph 3 itself.

The State responds that the grants do not violate Article I, Paragraph 3 because they will be used to fund classrooms, libraries, and computer and audio-visual equipment, not places of worship or "ministries." Presenting its own review of the history of the New Jersey Constitution's religion clauses, the State maintains that the government is not precluded from providing funds for religious instruction or to sectarian

schools.  Further, the State contends that appellants read Resnick too broadly, and that the Court's decision in that case must be interpreted in light of the generally more stringent judicial approach to evaluating public aid to religious organizations that existed at the time thirty-eight years ago.

B.

We begin our examination by focusing upon the text of Article I, Paragraph 3:

> No person shall be deprived of the inestimable privilege of worshipping Almighty God in a manner agreeable to the dictates of his own conscience; nor under any pretense whatever be compelled to attend any place of worship contrary to his faith and judgment; nor shall any person be obliged to pay tithes, taxes, or other rates for building or repairing any church or churches, place or places of worship, or for the maintenance of any minister or ministry, contrary to what he believes to be right or has deliberately and voluntarily engaged to perform.
>
> [N.J. Const. art. I, ¶ 3 (emphasis added).]

"This paragraph is nearly verbatim from Article XVIII of the 1776 Constitution.  It appeared as Article I, Section 3, in the 1844 Constitution and was carried over in the 1947 Constitution."  Robert F. Williams, The New Jersey State Constitution, A Reference Guide 32 (1997).

Given the haste and informality surrounding the adoption of the 1776 Constitution while British warships were gathering off

the coast of Sandy Hook,[6] little is known of the intent of its drafters.  Id. at 1-5; John Bebout, Introduction to Proceedings of the New Jersey State Constitutional Convention of 1844, at xvi (N.J. Writers' Project, Work Projects Admin. ed., 1942) ("1844 Proceedings"); 1 Proceedings of the New Jersey Constitutional Convention of 1947, at v ("1947 Proceedings"). Although the 1776 Constitution contained no separate Bill of Rights, it included important rights within its structural provisions.  Williams, supra, at 2.  In particular, Articles XVIII and XIX of the 1776 Constitution "reflected early notions of religious freedom."  Id. at 3; see also 1844 Proceedings, supra, at xv (noting that "religious liberty was guaranteed, except to papists").

Article XVIII was incorporated into the Bill of Rights of the State Constitution of 1844 after amendments proposing to place limits on individuals' "dictates of conscience" were briefly debated and then rejected.  1844 Proceedings, supra, at 52, 141-42.  No other discussion of the provision, which became

---

[6] See John Bebout, Introduction to Proceedings of the New Jersey State Constitutional Convention of 1844, at xvi (N.J. Writers' Project, Work Projects Admin. ed., 1942) (citing Charles R. Erdman, Jr., The New Jersey Constitution of 1776, at 49 (Princeton Univ. Press, 1929)).

Article I, Section 3, was apparently preserved in the 1844 record.[7]

However, there was considerable discussion in 1844 about drafting a constitutional article to create "common schools" that would be free for all classes and sects. Id. at 345-47, 405. Amendments were proposed that would prohibit the School Fund[8] from being used to promote sectarian views of religion. Debate focused on the sectarian strife that might arise from the creation of such common schools. Id. at 345-47, 400-05, 550. Even though no article was ultimately adopted to create common schools, these discussions are significant because they arguably support the State's contention that the framers of the 1844 Constitution did not interpret Article I, Section 3, as barring the State from providing public funds to sectarian schools. Rather, it is at least some evidence that the 1844 framers

---

[7] The 1942 publication, sponsored by the New Jersey State House Commission, summarized the 1844 proceedings after a gap of almost a full century. The volume is derived from stenographic reporters' notes of the debates that were published daily in newspapers during the 1844 Convention. Williams, supra, at 143.

[8] The State School Fund was established by the Legislature in 1818. L. 1817, c. 26, as amended by L. 1818, c. 100; see Everson v. Bd. of Educ., 133 N.J.L. 350, 353 (E. & A. 1945) (discussing history of the School Fund), aff'd, 330 U.S. 1, 67 S. Ct. 504, 91 L. Ed. 711 (1947). The permanency, proper use, and administration of the School Fund was ensured through the adoption of a constitutional provision in 1844. N.J. Const. of 1844, art. IV, § 7, ¶ 6.

A-4399-13T2

believed a specific constitutional amendment was required to prevent such a result.

Free public schools were once again a topic of deliberation by the 1873 New Jersey Constitutional Commission. See Peter J. Mazzei & Robert F. Williams, "Traces of Its Labors": The Constitutional Commission, The Legislature, and Their Influence on the New Jersey Constitution, 1873-1875, at 117-74 (2012).[9] The 1873 Commission considered an amendment to the 1844 Constitution that would provide for free, public schools, and debated the inclusion of a prohibition that "'[n]o money . . . be paid to any creed, religion, church or sectarian association . . . .'" Id. at 145 (quoting The Constitutional Commission, Daily St. Gazette, Oct. 30, 1873). Further, the 1873 Commission discussed amendments defining "free schools" or "public schools" as excluding "schools controlled by or under the influence of any creed or religious society, or denomination whatever," and prohibiting the appropriation of money for the use of any seminary or other institution of learning "when the said institution is controlled by any creed, sect or religious society." Id. at 148 (quoting The Constitutional Commission, Daily St. Gazette, Nov. 14, 1873).

---

[9] Available at https://statecon.camden.rutgers.edu/books.

As Mazzei and Professor Williams have commented: "It is absolutely clear, based on the [1873] Commission's proceedings and report, that the Commission ultimately agreed with [Commissioner Jacob L.] Swayze's original intent that public schools were free and that religious, private or college preparatory schools would <u>not</u> be eligible for state funds." <u>Id.</u> at 154 (emphasis added). Hence, the Commission's report to the 1874 Legislature proposed adding text to the School Fund provision, <u>N.J. Const. of 1844</u>, art. IV, § 7, ¶ 6, establishing public schools and defining "free schools" as not including religious schools. Mazzei & Williams, <u>supra</u>, at 159.

Senators took issue with various aspects of the proposed amendment, but there appeared to be no recorded objection to the exclusion of sectarian schools from receiving school funds. <u>Id.</u> at 161, 166, 168. However, the amendment that ultimately passed in 1874 by the Legislature, which provided for a thorough and efficient system of "free public schools," contained no specific reference to sectarian schools.[10]  <u>Id.</u> at 171. The Catholic Church nevertheless interpreted the amendment as barring the

---

[10] The "thorough and efficient" clause that was passed by the Legislature and adopted after a special election remains a vital part of the current constitution. <u>N.J. Const.</u>, art. VIII, § 4, ¶ 1.  <u>See generally</u> <u>Abbott v. Burke</u>, 100 <u>N.J.</u> 269 (1985); <u>Robinson v. Cahill</u>, 69 <u>N.J.</u> 133 (1975).

diversion of public funds to parochial schools and strenuously opposed its adoption in the 1875 election.  Id. at 211-213.

Like the drafters of the Constitution of 1844, the members of the 1873 Constitutional Commission never conclusively resolved whether Article I, Section 3 prevented the State from providing funds to religious schools.  Rather, they sought to attain that result by limiting the fund recipients to "free public schools."

A century later, the delegates at the Constitutional Convention of 1947 incorporated Article I, Section 3 of the Constitution of 1844 into the 1947 Constitution's final draft, doing so with little discussion.  3 Proceedings of the Constitutional Convention of 1947, at 167.  Similar to the 1844 convention, however, there were deliberations in 1947 concerning state funding of religious educational institutions, particularly with regard to busing students to parochial school. 5 Proceedings of the Constitutional Convention of 1947, at 791-807.  As at the prior convention, these deliberations in 1947 focused on financial matters rather than on fundamental religious liberties.

A proposal to bar the State from expending public money to aid any school or institution under the control of any religious denomination was originally submitted at the 1947 Convention by

a citizens' group to the Bill of Rights Committee. However, that proposal was transferred to the Taxation and Finance Committee. Id. at 791-92. During public comment over the proposal, a representative of the Presbyterian Church, William E. Dickey, asserted that Article I, Paragraph 3 prohibited the use of public funds to support the Catholic Church. Id. at 799. His argument apparently provoked no action, however, and efforts to include language expressly prohibiting the State from paying public funds to assist religious schools died in committee. Id. at 800-06.

The State argues that "[i]t is clear that the framers of the 1947 [C]onstitution did not interpret [Article I, Paragraph 3] to prohibit aid to sectarian schools. Had that been the case, there would have been no need for Committee discussion on whether to include such a new provision in the 1947 Constitution." Appellants respond that the 1947 proposed amendment to prohibit funding of religious schools was "rejected because it was not deemed necessary, as aid to religious schools was already prohibited" by Article I, Paragraph 3. Appellants partly base that contention on a statement of the Committee Secretary recorded in the 1947 proceedings, noting that "[t]he parochial school system [had] developed without any public aid

whatsoever and it will continue to develop without any public aid." Id. at 805.

This mixed constitutional history does not easily reveal whether Article I, Paragraph 3 was or was not intended to prohibit public aid to religious organizations to support their activities in religious instruction and the training of future clerics. The parties have each asserted substantial competing interpretations.

The State presents a plausible argument that the provision was not intended to ban such public grants and expenditures because the 1844 Delegates and 1873 Commissioners were concerned that funds could still be diverted to sectarian schools, and therefore took care to define "public schools" in such a way as to exclude institutions controlled by religious sects. Later, the 1947 Delegates seemingly rejected the notion that Article I, Paragraph 3 prohibited public funding of sectarian schools, first by transferring the proposed amendment barring religious-school aid from the Bill of Rights Committee to the Tax and Finance Committee, and then by discussing the merits of the proposed amendment without ever expressing an opinion in the record that it was unnecessary.

The Committee Secretary's remarks in 1947 are open to differing reasonable interpretations. The Committee Secretary,

A-4399-13T2

who was a Catholic, listened to several commentators condemn the Catholic Church and accuse parochial schools of invading the public purse. When a speaker asked the Committee Secretary "why is your church asking for [transportation aid]?" the Committee Secretary responded that the parochial schools were doing fine and the Catholic Church wanted no public control or supervision. Id. at 805-06. The Committee Secretary added that the Catholic people simply believed that their children were entitled to free public-funded bus transportation. Id. at 806. His statements could reasonably be construed to signify a belief that public funding of sectarian schools was not already prohibited by Article I, Paragraph 3. Such an interpretation is consistent with the Committee Secretary's assertion that students were entitled to free transportation to parochial schools.

On the other hand, appellants have presented substantial arguments in favor of the hypothesis that the 1844 Delegates, the 1873 Commissioners, and the 1947 Delegates did not adopt any proposals to explicitly ban public aid to religious schools because those respective drafters implicitly were satisfied that Article I, Paragraph 3, as originally drafted by the 1776 framers, already prohibited such financial support. Although the Committee Secretary in 1947 was in favor of free transportation to parochial schools, he repeatedly responded to

constitutional criticisms raised by various speakers by questioning whether such transportation could even be considered public "aid" or "support" of those schools or their affiliated religions. Id. at 797-98, 800-01, 804, 806. In essence, appellants contend that years later the Court in Resnick, which we discuss infra, appropriately enforced the intended prohibition of Article I, Paragraph 3 by striking down the public subsidy afforded to sectarian groups in that case.

We do not resolve this historical dispute here. Our reluctance to do so is founded in part by principles of statutory construction. Generally, courts should exercise caution when considering the import of a legislative body's rejection of proposed amendments to a codified scheme. Although the failure to adopt an amendment can, at times, indicate a conscious decision to reject the amendment's provisions, see, e.g., State v. Crawley, 90 N.J. 241, 246 (1982) (finding that the Legislature's rejection of a proposed amendment to the criminal code indicated "a conscious decision" not to include the provision), such inaction conversely may signal that the law as written already achieves the sought-after objective. See generally 2A Norman J. Singer & J.D. Shambie Singer, Sutherland Statutory Construction § 48:18 at 633-37 (7th ed. 2014). We need not decide which side's historical argument concerning

27

Article I, Paragraph 3 is more persuasive because the Supreme Court has already adopted a dispositive construction of the provision in Resnick.

The relevant circumstances in Resnick were as follows. Defendant, the East Brunswick Township School Board, had a long-standing policy of allowing local groups, including religious organizations, to rent its school facilities during non-school hours at below cost. Resnick, supra, 77 N.J. at 93-94. Various religious organizations used the facilities for worship, religious instruction, prayer meetings, social gatherings, and Hebrew language classes. Id. at 94-95. Some religious artifacts and Sunday School materials were stored at the schools. Id. at 95.

The plaintiff in Resnick filed suit to enjoin the school board's practice of allowing the religious organizations to use the public school facilities below cost. The plaintiff argued that such action violated Article I, Paragraph 3's prohibition against public expenditures in support of religion. The plaintiff also alleged violations of the Establishment Clause of the First Amendment of the United States Constitution and that a statutory provision, N.J.S.A. 18A:20-34, did not authorize public school buildings to be used for such religious activities.

The trial judge in <u>Resnick</u> found that <u>N.J.S.A.</u> 18A:20-34 neither contemplated nor allowed the public schools to be used by religious groups for worship services. <u>Id.</u> at 96; <u>see also</u> <u>Resnick v. E. Brunswick Twp. Bd. of Educ.</u>, 135 <u>N.J. Super.</u> 257, 262 (Ch. Div. 1975). However, the judge did find that the statute permitted the schools to be used for Hebrew instruction and Sunday School. <u>Resnick</u>, <u>supra</u>, 77 <u>N.J.</u> at 96. With respect to the latter, the judge concluded that even such a limited instructional activity involved an outlay of taxpayer funds for utilities, and thereby violated the constitutional prohibition in Article I, Paragraph 3. <u>Ibid.</u> To cure the statute's constitutional infirmity, the judge ruled that the religious organizations were obligated to pay rent commensurate with the school district's actual costs for utilities, administrative and janitorial services.

The trial judge further concluded that the religious organizations use of the schools also violated the First Amendment. <u>Id.</u> at 97; <u>see also</u> <u>Resnick</u>, <u>supra</u>, 135 <u>N.J. Super.</u> at 268. On this issue, the judge found the federal constitution more restrictive than the state constitution and required the board's program, even at rental rates equaling costs, to cease within a year. As a caveat, the judge noted that his decision did not nullify leases of public school facilities to religious

29

bodies at competitive market rates, nor did it bar the temporary use of school facilities by religious groups during emergencies, such as after a fire or flood. Resnick, supra, 77 N.J. at 97. This court affirmed the trial judge's decision, substantially for the reasons he expressed in his published opinion. Ibid.; see also Resnick v. E. Brunswick Twp. Bd. of Educ., 144 N.J. Super. 474 (App. Div. 1976).

The Supreme Court largely upheld the trial judge's decision in Resnick, although a majority of the Justices voted to modify the court's ruling to allow religious organizations to continue to use the school district's facilities on a temporary basis so long as those groups "fully reimburse school boards for related out-of-pocket expenses[.]" Resnick, supra, 77 N.J. at 120. The majority found that the trial court had gone too far in requiring the sectarian groups to pay a commercial rental rate and in placing a one-year limit on their continued use of the school premises. Ibid.

Although Justice Clifford and Judge Conford dissented from certain facets of the majority's analysis in Resnick, the members of the Court were unanimous in striking down the school board's existing leasing arrangement. Justice Clifford stated that the trial court's ruling, which this court had upheld, should be affirmed without modification, reinstating the market-

value rental charge requirement because he considered the charge mandated by the federal Establishment Clause to avoid improper entanglement of church and state.  Id. at 121-36 (Clifford, J., dissenting).  Judge Conford, sitting on the Court by temporary designation, went even further, opining that "any use of publicly built and maintained buildings, especially public schools, for the [religious groups'] stated purposes is antithetical to the fundamental principle of separation between church and state embedded in both the federal and State constitutions."  Id. at 137 (Conford, J., dissenting).

The majority opinion in Resnick ruled that Article I, Paragraph 3, when "fairly read, specifically prohibits the use of tax revenues for the maintenance or support of a religious group."  Id. at 102.  The majority cautioned that the provision should not be carried to "an extreme," and the State need not withhold police or fire protection because of a property's sectarian use.  Id. at 103 (citing Clayton v. Kervick, 56 N.J. 523, 529 (1970), vacated on other grounds, 403 U.S. 945, 91 S. Ct. 2274, 29 L. Ed. 2d 854 (1971)).  The majority provided no further analysis of the issues under Article I, Paragraph 3, other than to repeat its holding under the provision as signifying that "the state constitution does require that religious organizations be singled out among nonprofit groups in

general _as being ineligible_ for certain benefits which are _partly subsidized by tax-generated funds_[.]"  Id. at 103-04 (emphasis added).[11]

No reported New Jersey cases since Resnick have interpreted the "religious aid" prohibition of Article I, Paragraph 3. Other reported state decisions discussing Article I, Paragraph 3 have arisen instead in the context of claimed violations of free exercise of religion and, when doing so, interpreted it co-extensively with the Federal Free Exercise Clause, U.S. Const. amend. I.  See, e.g., S. Jersey Catholic Sch. Teachers. Org. v. St. Teresa of the Infant Jesus Church Elementary Sch., 150 N.J. 575, 593-94 (1997) (finding that allowing lay teachers to unionize did not infringe on a parochial school's free exercise of religion); State v. Perricone, 37 N.J. 463, 471-74 (finding that the administration of a blood transfusion to a child in contradiction to the parents' deeply held religious beliefs did not infringe on the parents' free exercise of religion), cert.

---

[11] In the portion of the majority's opinion that followed, the Court noted that the State Constitution's version of the Establishment Clause in Article I, Paragraph 4 is "less pervasive" than the federal counterpart provision, and ruled that the school board's leasing arrangements did not "appear to" violate that provision, "since no one religious sect was preferred over other sects." Id. at 104.  Because our decision concludes that the grants to the Yeshiva and the Seminary violate Article I, Paragraph 3, we need not address the separate issues posed by appellants under Article I, Paragraph 4.

denied, 371 U.S. 890, 83 S. Ct. 189, 9 L. Ed. 2d 124 (1962);
Bethany Baptist Church v. Deptford Twp., 225 N.J. Super. 355,
362-63 (App. Div. 1988) (finding that requiring a church to pay
tax on property acquired after the yearly assessment date did
not impede its free exercise of religion); see generally William
F. Cook, Note, The New Jersey Bill of Rights and a "Similarity
Factors" Analysis, 34 Rutgers L.J. 1125, 1137-41 (2003)
(suggesting that Article I, Paragraph 3 may be more pervasive
than its federal counterpart and thus deserving of distinct
analysis).

The federal court had occasion to discuss Resnick and
Article I, Paragraph 3 in Pope v. East Brunswick Board of
Education, 12 F.3d 1244 (3d Cir. 1993). In Pope, a student
challenged a school board's refusal to certify her Bible Club as
a student organization. Id. at 1245. After concluding that the
board's action violated the Federal Equal Access Act, 20
U.S.C.A. §§ 4071-74, the Third Circuit briefly addressed the
board's argument that the costs it would incur from recognizing
the Bible Club would violate Article I, Paragraph 3 of the New
Jersey Constitution. Id. at 1256. Relying on the holding in
Resnick, the Circuit noted that New Jersey courts have held that
"off-hours use of school facilities by church groups did not
offend the state constitution." Ibid. The Circuit then found

that the incidental cost of providing space for student meetings was a de minimis expenditure of public funds.[12]  <u>Ibid.</u>

Because the millions of dollars collectively involved in the present case are surely not "de minimis," the reasoning in <u>Pope</u> is not instructive.  <u>Pope</u> does reflect, however, that the federal court recognized our Supreme Court's opinion in <u>Resnick</u> as setting forth the authoritative interpretation of Article I, Paragraph 3.

The State attempts to distinguish <u>Resnick</u> from this case by arguing that the grants to the Yeshiva and the Seminary would benefit college and graduate students, who it asserts are not as susceptible to religious indoctrination as the elementary school students who used the East Brunswick public school facilities. The State also argues that providing money for capital improvements does not equate to "maintaining a minister or ministry" as those terms are commonly understood in our contemporary times.  But neither of these considerations was a factor in <u>Resnick</u>, where the facilities were used both for the religious instruction of children and for adult worship, prayer meetings, and social gatherings.  <u>Resnick</u>, <u>supra</u>, 77 <u>N.J.</u> at 94-

---

[12]  It is questionable whether the holding in <u>Resnick</u> truly supports the <u>Pope</u> court's conclusion, since the difference between the hourly rent charged and actual out-of-pocket costs in <u>Resnick</u> was only about $2.25, which is arguably a de minimis expense.  <u>Resnick</u>, <u>supra</u>, 77 <u>N.J.</u> at 94 n.1.

95. Moreover, the Court made no analytic distinction in <u>Resnick</u> that hinged upon the ages of the users, even if we were to agree with the debatable proposition that college and graduate students are not particularly susceptible to religious indoctrination.

The school classrooms in <u>Resnick</u> did not lose their non-sectarian character simply because they were used after hours at times for religious purposes. At least one of the uses the Court identified in <u>Resnick</u> — Hebrew language instruction — was arguably non-religious in nature. However, it was the sectarian nature of the groups renting the space for such instruction that was of primary concern to the Court in striking down the subsidized arrangement.

Here, unlike other broad-based liberal arts colleges that received grants, both the Yeshiva and the Seminary are sectarian institutions. Their facilities funded by the Department's grants indisputably will be used substantially if not exclusively for religious instruction. The planned uses by these sectarian institutions clearly fall within the prohibitory ambit of <u>Resnick</u>.

We discern no principled distinction between the consumption of public resources that was invalidated under Article I, Paragraph 3 in <u>Resnick</u> and the payment of taxpayer-

funded grants to the Yeshiva and the Seminary. The fact that most or many of the students at the Yeshiva and the Seminary do not eventually become "ministers," rabbis, or other clergy does not cure the constitutional infirmity, just as the fact that the adults and children who received religious instruction in Resnick were laypeople did not alter the Court's analysis. Nor does the fact that the Department's awards to these sectarian schools were part of a larger competitive grant process involving non-sectarian recipients solve the problem. The public school buildings in Resnick were also used by non-religious groups, but that did not eliminate the district's constitutional violation in allowing religious groups to use them on a subsidized basis.

As an alternative to its attempt to distinguish Resnick, the State argues that the Court's 1978 opinion is out of step with more recent national trends in constitutional jurisprudence concerning religion, particularly case law involving the Establishment Clause. More specifically, the State submits that First Amendment jurisprudence has shifted over the years to relax the circumstances under which government aid for religious schools is permitted. See generally, Ira C. Lupu et al., Pew Research Ctr., Shifting Boundaries: The Establishment Clause

and Government Funding of Religious Schools and Other Faith-Based Organizations (2009).[13]

We will not speculate as to whether this asserted shift in federal Establishment Clause jurisprudence, assuming there is truly such a shift, affects the independent meaning and force of the New Jersey Constitution.  Indeed, our state has a rich tradition of sometimes construing our own state constitutional protections of individual rights more broadly than cognate provisions in the United States Constitution.  See Williams, supra, xix (noting that the New Jersey Supreme Court "has continued to consider interpretations of the state constitutional rights provisions that are broader, or more protective of citizens, than the decisions of the United States Supreme Court interpreting the federal Constitution"); see also State v. Hunt, 91 N.J. 338, 363-68 (1982) (Handler, J., concurring) (identifying "divergence factors" for determining whether a provision within the State Constitution should be interpreted more broadly than its federal counterpart). Moreover, the differences of viewpoint between the majority of

---

[13]  Available at http://www.pewforum.org/files/2009/05/funding.pdf.

the Justices and Justice Clifford's dissent[14] in <u>Resnick</u> hinged only upon the analysis under the federal Establishment Clause and not over Article I, Paragraph 3, indicating that a proper interpretation of the latter is not to be affected by the federal jurisprudence. <u>See</u> <u>Resnick</u>, <u>supra</u>, 77 <u>N.J.</u> at 121-36 (Clifford, J., dissenting) (disagreeing only with the majority's interpretation of the statute regarding boards of education and the federal Establishment Clause).

We acknowledge that the Court's discussion of Article I, Paragraph 3 in <u>Resnick</u> was rather abbreviated. <u>Resnick</u> did not delve into the extensive constitutional history that has been presented to us by the parties and which we have canvassed in this opinion. We have set that history out at some length for the sake of completeness. We stop there, however, because <u>Resnick</u> remains the controlling Supreme Court precedent.

<u>Resnick</u> has never been overruled or called into question by the Court. As an intermediate appellate court, we are bound by the Court's holding. <u>See</u> <u>N. Jersey Media Grp., Inc. v. Twp. of Lyndhurst</u>, 441 <u>N.J. Super.</u> 70, 101 (App. Div. 2015) (citing <u>White v. Twp. of N. Bergen</u>, 77 <u>N.J.</u> 538, 549-50 (1978)) (noting

---

[14] As we have noted, Judge Conford's more stringent approach in his own dissent rested upon both the federal and state constitutions. <u>Resnick</u>, <u>supra</u>, 77 <u>N.J.</u> at 137-38 (Conford, J., dissenting).

that "intermediate appellate courts are 'bound, under the principle of <u>stare decisis</u>, by formidable precedent'").

For these reasons, we conclude that <u>Resnick</u> compels invalidation of the grants to the Yeshiva and the Seminary under Article I, Paragraph 3 of the New Jersey Constitution. In light of that disposition, we need not and do not reach appellants' separate claims of invalidity under Article I, Paragraph 4; Article VIII, Section 3, Paragraph 3; and the LAD. We also caution that our opinion should not be construed to adjudicate fact patterns involving public grants to different religiously affiliated institutions of higher education which have a broader non-sectarian scope and thereby may be distinguishable from the Yeshiva and the Seminary, including the other recipients of grants from the 2013 Solicitation.[15]

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[15] As just one example of the limited scope of our opinion, it should not be read to nullify under Article I, Paragraph 3 public grants to broad-based liberal arts colleges and universities just because they happen to have a Religious Studies Department or a chapel on campus.

A-4399-13T2