PER CURIAM
*933 **184 This appeal involves a challenge to state action based on, among other grounds, the Religious Aid Clause of Article I, Paragraph 3 of the State Constitution, specifically its prohibition against the use of public funds "for the maintenance of any minister or ministry." The challenge arose following the State Secretary of Higher Education's (Secretary) determination to award grant monies to a yeshiva and to a theological seminary as part of a state program to subsidize facility and infrastructure projects for higher education institutions in New Jersey. The Appellate Division ended the challenge by focusing on the Article I, Paragraph 3 issue to the exclusion of all other state constitutional and statutory claims raised in the case. The appellate panel determined that prior case law concerning our Constitution's Religious Aid Clause required invalidation of the grants to the yeshiva and theological seminary. We granted the State's petition for certification seeking review of that determination.
The State maintains that the proper constitutional analysis in this matter turns on the use to which these higher education institutions will put the monies, not the nature of the institutions themselves. While plaintiffs do not dispute that the use of funds must be addressed, they emphasize the pervasively sectarian nature of the institutions and the avowed, and practically implemented, purpose of each to train individuals in theological and religious study, which plaintiffs contend profoundly affects the analysis in this matter.
This case comes before us as an appeal from final administrative action by the Secretary approving the grants. The present record is comprised essentially of the grant applications submitted by the institutions to the Secretary. The arguments of the parties reveal competing views of (1) the sectarian nature of these institutions of higher education; (2) whether, in the setting of the curriculum and training programs of these particular institutions, the grant funds will necessarily be used in the "maintenance of any minister or ministry"; and (3) the adequacy of promised restrictions or other **185 curbs against sectarian use of the grant proceeds. Because those factual disputes require resolution before the Secretary can make a properly informed decision on the grant applications, we conclude that judicial review is premature.
A remand is necessary to allow for the development of a proper record, with fact-finding. Adversarial testing of the evidence in support of the parties' presentations is required here. Only based on such a record can the courts appropriately review the Secretary's decision to award, or not, grants to these institutions, in light of the constitutional arguments raised by plaintiffs. Because we conclude that an informed *934 administrative decision could not have been made without the benefit of such a record, we remand this matter to the Secretary, and not to the trial court, in order that a contested case proceeding be conducted prior to the ultimate administrative decision of the Secretary concerning the challenged grants.
I.
A.
The background to this appeal is the "Building Our Future Bond Act" (the Act), which was enacted into law on August 7, 2012. L. 2012, c. 41. The Act authorized the State to effectuate the means to subsidize capital improvement projects for institutions of higher education. At the ensuing Election Day in November 2012, New Jersey voters approved a referendum authorizing the issuance of $750 million in general obligation bonds, the proceeds of which were to support the purposes of the Act.
The State proceeded to issue bonds and secure funds to be available to support higher education capital-improvement projects; at about the same time, the State solicited applications from higher education institutions interested in receiving such funding. Following the receipt and review of submitted applications, on April 29, 2013, the Governor announced that Secretary of Education Rochelle Hendricks had submitted to the Legislature for **186 approval a list of 176 higher education capital construction projects to forty-six institutions of higher education, which included funding for research laboratories, computerized classrooms, and interconnected cyber networks. See L. 2012, c. 41, § 5(g); N.J.A.C. 9A:18-1.7. After sixty days elapsed, the grants were deemed approved by the Legislature. See N.J.A.C. 9A:18-1.7(d).
Of the forty-six higher education institutions that received funding, at least nine were religiously affiliated. Relevant for our purposes, two of those institutions were the Beth Medrash Govoha (the Yeshiva) and the Princeton Theological Seminary (the Seminary).
B.
From the administrative record submitted to the Appellate Division, we glean the following information. Largely, except where noted, the information comes from material gathered during the application process conducted by the Secretary, either in the form of representational responses to the State's application questions or in attachments submitted with the application.
The Yeshiva is located in Lakewood Township and serves more than 6,000 students. It is accredited by the Association of Advanced Rabbinical and Talmudic Schools. The Yeshiva describes Talmudic Studies as "a broad compendium of scholarship that draws on knowledge from a wide array of sources and disciplines, among which are references to religious texts such as the Bible." For purposes of elucidating the discussion, we add that a commonly accepted definition describes the Talmud as
the basic compendium of Jewish law and thought; its tractates mainly comprise the discussions collectively known as the Gemara, which elucidate the germinal statements of law (mishnayot) collectively known as the Mishnah; when unspecified refers to the Talmud Bavli, the edition developed in Babylonia, and edited at the end of the fifth century C.E.; the Talmud Yerushalmi is the edition compiled in the Land of Israel at the end of the fourth century C.E.
[Talmud, Chabad.org, https://www.chabad.org/search/keyword_cdo/kid/2700/jewish/Talmud-The.htm *935 (last visited April 17, 2018).]
**187 Courts have employed similar descriptions. See, e.g., State v. Freedom From Religion Found., 898 P.2d 1013, 1022 n.9 (Colo. 1995) ("The Talmud, an 'all-embracing constitution of medieval Jewish life,' is an extended, multivolume compilation of rabbinic teachings, including law, morality, and theology. The Hebrew word talmud means 'study.' The original writings, which were substantially supplemented over time, were 'completed' by the middle of the fifth century." (citing 14 The Encyclopedia of Religion 256-57 (Mircea Eliade et al. eds., 1987) ) ).
According to its mission statement, the Yeshiva is "an institution of Higher Education that specializes in advanced Talmudic scholarship. Its primary objective is to produce Talmudic scholars and to thereby provide firm, lifelong foundations for its students, graduates and their communities." The Yeshiva further represents that "[a]n integral part of [its] scholastic and professional aims is ethical and moral growth and maturity of the students, based on Jewish ethics and philosophy."
The Yeshiva offers four programs: a bachelor's degree in Talmudic Studies, a master's degree in Rabbinical and Talmudic Studies, and two certificates in graduate Talmudic Studies. The Yeshiva explained that fewer than five percent of students participate in a program that leads to ordination, and that the ordination program's religious instruction is "opt-in, not opt-out." The application record does not clarify whether the other courses constitute religious instruction, but does specify that "portions of the curriculum may utilize or reference texts with religious origin."
That said, the graduate course catalog included with the Yeshiva's grant application lists a series of courses that appear to correspond almost exclusively to tractates of Talmud, with a few additional course offerings that explore the work of selected rabbis, largely in the context of ethics. The undergraduate program mandates that each student complete a Bachelor of Talmudic Studies, including 150 credit hours, 140 of which are taught by the Talmud Department. The sample curriculum for this program illustrates that each student is expected to complete four courses **188 each semester: two in Talmud, one in jurisprudence-a course not described in the course description, and one in Jewish ethics. From the record as presently developed, the Yeshiva does not provide any program unrelated to Talmudic scholarship and does not offer courses in science, technology, engineering, mathematics, or general secular study.
The Yeshiva received a grant award totaling $10,635,747. The award included a grant of $5,118,000 to fund construction of a new library and research center, and a grant of $5,517,747 to fund construction of a three-story academic center, which would contain study halls, classrooms, a reference library, a computer room, faculty offices, and academic service rooms. As a condition of its receipt of grant funds, the Yeshiva was required to submit a Sectarian/Religiously Affiliated Educational Institution Questionnaire to the State. In answering the questions posed by that form, the Yeshiva stated that it was an "independent institution rooted in Jewish tradition," that it has "no formal affiliation to any hierarchical religious organization," and that the funds would not be used to finance any chapels or places of worship. In a supplemental questionnaire provided to the State, the Yeshiva further stated that "all classes may be offered" in the facilities subsidized by grant funds, but that the project facilities would not be used for "anything associated with ordination."
*936 The Yeshiva acknowledged that its curriculum includes "religious study," focusing, as noted, on its answers in respect to ordination, that its faculty are all of the Jewish faith, and that only men are accepted for admission. The Yeshiva further stated that "[a] small number of specialized faculty administer a set of oral, one-on-one examinations on topics of practical religious matters." There is no other concession that the Yeshiva provides religious instruction.
The Yeshiva contends that their programs focused on Talmudic Studies "contain a critical thinking liberal-arts core ... [and] [a]lthough [the Yeshiva] does not directly offer degree programs in the STEM concentrations, it does provide its students with **189 broad-based knowledge and the transferable skills to exceed in graduate programs in Science, Technology, Engineering, and Mathematics." For example, the course description for Beginning Talmud Survey 1 and 2 states that the study of portions of Talmud tractates is "to gain acquaintance with the broad panoply of Talmudic knowledge and approach to the disciplines of Logic, Ethics, Philosophy, Religion, Economics, Law, Sociology, History, Psychology, Literature, Classical Civilizations, Science, Mathematics, Language, and Political Science."
C.
The Seminary is a coeducational denominational school located in Princeton offering graduate programs in theological education. It is accredited by the Association of Theological Schools and the Middle States Commission on Higher Education. The Seminary offers the following degrees: Master of Divinity; Master of Arts (Christian Education); Master of Theology; and Doctor of Philosophy (Biblical Studies, History and Ecumenics, Theology, Practical Theology, or Religion and Society). It also offers a number of continuing education programs through various initiatives, institutes, and inter-institutional agreements. According to its mission statement, it "prepares women and men to serve Jesus Christ in ministries marked by faith, integrity, scholarship, competence, compassion, and joy, equipping them for leadership worldwide in congregations and the larger church, in classrooms and the academy, and in the public arena." The Seminary also refers to itself as
[a] professional and graduate school of the Presbyterian Church (U.S.A.) [that] stands within the Reformed tradition, affirming the sovereignty of the triune God over all creation, the Gospel of Jesus Christ as God's saving word for all people, the renewing power of the word and Spirit in all of life, and the unity of Christ's servant church throughout the world.
The Seminary applied for and was awarded three grants through the program totaling $645,323. One grant, for $241,722, was to enhance the information technology system at the Seminary's library. Counsel, at oral argument, informed us that the award would provide for infrastructure improvement only and **190 would not include digitalization of the library's contents. A second grant, for $113,711, was to be applied toward construction of a "training room," which would service faculty, students, and staff with software training.[1]
The Seminary also submitted to the Secretary a Sectarian/Religiously Affiliated Educational Institution Questionnaire in which it stated that it is an "independent *937 educational institution with an historical and continuing relationship with the Presbyterian Church (USA)." It explained that the proposed projects did not "contain any existing or proposed areas to be used for prayer or worship," that the grants would not fund any "chapels or other places of worship," and that there would not be "any religious use of or religious instruction in any of the Project Facilities." In its project summary for the upgrades to the library's information-technology (IT) infrastructure, the Seminary asserted that the grant funds will allow the public to access its scholarly content, including academic materials and publications, and will "create a repository to expand scholarly communications as well as make scholarly material open to interested parties outside the seminary."
The Seminary also maintained that the enhanced IT infrastructure will increase inter-institutional communication and education, stating that the grant funds will "result in the enhancement of Open Educational Resources (OER) for scholarly collaboration and support services for educators and researchers" and will "connect infrastructure for intra- and inter-institutional repositories." According to the Seminary, that connected infrastructure will allow the Seminary to share its repository with other institutions with which it has a reciprocal relationship, including Princeton University and the Westminster Choir College of Rider University, whose students will be able to **191 access the library electronically. The Seminary stated that by connecting its infrastructure it will be able to share its "world-class research library" and meet the growing demand for electronic and interactive access to its academic and research resources.
The Seminary made similar assertions concerning the grant for the training room, stating in its application that the grant funds will add a number of technological enhancements to the training room that will "increase its telecommunication offerings, as well as facilitate access to key video, audio, and data resources," and keep the training room "compatible with inter-institutional communication." The training room will apparently be used for software and other computer training, providing "on-site and distance training" to train faculty and students on "emerging tools necessary for their academic work."
The Seminary acknowledged a number of other, sectarian uses to which the projects may be put. The Seminary stated in its project description for the library that it is "developing a core Internet resource for the study of theology and religion." In its application for grant funds for the training room, the Seminary noted that its expansion through the use of grant funds will allow for building partnerships with organizations such as the Administrative Personnel Association of the Presbyterian Church. In its technology plan, submitted as part of its application for renovation of the library, the Seminary stated that the services provided as part of the upgrades to their audio and video equipment will include "[a]ll lectures and special campus events, from Presidential lectures to Chapel services." The Seminary also stated in its questionnaire that "the training facility potentially may be used for software programs employed in both religious instruction and religious study."
Moreover, the Seminary also stated that "[a]ll degree students are expected to be of the Christian faith"; that the faculty are required to be of the Christian faith; and that the curriculum includes religious instruction. It also stated in that report that the **192 "proposed project is essential to the Seminary's educational mission" of "preparation of men and women for ministry to congregations and for Christian leadership *938 in communities and professional environments."
II.
The American Civil Liberties Union of New Jersey (ACLU-NJ), joined by several other parties,[2] filed a complaint in the Superior Court, Chancery Division, on June 21, 2013 against Secretary of Higher Education Rochelle Hendricks and State Treasurer Andrew Sidamon-Eristoff in their official capacities (hereinafter State or State defendants). The complaint did not name either the Yeshiva or the Seminary as parties in the matter. The complaint asserted that the monetary grants to the Yeshiva and the Seminary were improper because they were awarded to sectarian schools that "provide sectarian educations and ministerial training," in violation of Article I, Paragraphs 3 (the Religious Aid Clause) and 4 (the Establishment Clause) and Article VIII, Section 3, Paragraph 3 (the Donation Clause) of the State Constitution. Plaintiffs also alleged that the grants to the Yeshiva violated the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, because the Yeshiva "discriminates on the basis of sex" by not allowing women admission to the Yeshiva. The ACLU-NJ sought to enjoin the State Treasurer and State Secretary of Higher Education from disbursing the grant funds to the Yeshiva and the Seminary.
On July 15, 2013, the trial court entered a Consent Order under which plaintiffs agreed to withdraw their request for an injunction and defendants agreed to give plaintiffs notice before disbursing any of the contested funds. Determining that the lawsuit was an appeal from an agency action, the trial court transferred jurisdiction of the case to the Appellate Division pursuant to Rule 2:2-3(a)(2).
**193 The Appellate Division later denied plaintiffs' motion to remand the matter for further fact-finding.
The Appellate Division invalidated the grants to the Yeshiva and the Seminary, holding that the grants violated the Religious Aid Clause of the State Constitution. ACLU of N.J. v. Hendricks, 445 N.J. Super. 452, 454-55, 139 A.3d 92 (App. Div. 2016). The panel reached only the constitutional argument premised on a violation of the Religious Aid Clause and did not address the arguments pertaining to the alleged Establishment Clause or Donation Clause violations, or the LAD claim, because the case was decided under the Religious Aid Clause. Id. at 477-78, 139 A.3d 92.
The panel reasoned that its analysis under Article I, Paragraph 3 of the State Constitution was controlled by this Court's holding in Resnick v. East Brunswick Township Board of Education, 77 N.J. 88, 389 A.2d 944 (1978). Id. at 454-55, 139 A.3d 92. That said, the panel observed that "the intended meaning of Article I, Paragraph 3 of the Constitution -a provision included in our State's first Constitution in 1776 and readopted in the 1844 and 1947 Constitutions-is not entirely clear" and that the provision's history was not discussed "at length in Resnick." Id. at 455, 139 A.3d 92. The panel examined Article I, Paragraph 3's incorporation into our current Constitution and concluded that its history did not reveal whether it "was or was not intended to prohibit public aid to religious organizations to support their activities in religious instruction and the *939 training of future clerics." Id. at 468-69, 139 A.3d 92.
With Article I, Paragraph 3's ambiguities providing no easy answer to the issue, the panel turned to Resnick for guidance concerning the clause. Id. at 470, 139 A.3d 92. After examining the facts and holding of that case, the panel determined that it could "discern no principled distinction between the consumption of public resources that was invalidated under Article I, Paragraph 3 in Resnick and the payment of taxpayer-funded grants to the Yeshiva and the Seminary." Id. at 475, 139 A.3d 92. Although noting the State's argument that Resnick is an older case, "out of **194 step with more recent national trends in constitutional jurisprudence concerning religion," the panel noted that Resnick has never been overruled and that therefore the panel was "bound" by its holding. Id. at 476-77, 139 A.3d 92. The panel concluded "that Resnick compels invalidation of the grants to the Yeshiva and the Seminary under Article I, Paragraph 3 of the New Jersey Constitution." Id. at 477, 139 A.3d 92.
As noted, the State defendants petitioned this Court for certification. They argue that the Appellate Division failed to apply the plain language of the Religious Aid Clause of the State Constitution and that Resnick does not control the disposition of this case. We granted the petition for certification. 228 N.J. 440-41, 157 A.3d 853 (2016). We also granted the motions of the Yeshiva, the Seminary, and the National Jewish Commission on Law and Public Affairs to appear as amici curiae in the appeal.
III.
A.
The New Jersey State Constitution provides as follows:
No person shall be deprived of the inestimable privilege of worshipping Almighty God in a manner agreeable to the dictates of his own conscience; nor under any pretense whatever be compelled to attend any place of worship contrary to his faith and judgment; nor shall any person be obliged to pay tithes, taxes, or other rates for building or repairing any church or churches, place or places of worship, or for the maintenance of any minister or ministry, contrary to what he believes to be right or has deliberately and voluntarily engaged to perform.
[ N.J. Const. art. I, ¶ 3.]
Until recently, when this Court thoroughly examined the history and import of the Religious Aid Clause of our State Constitution in Freedom From Religion Foundation v. Morris County Board of Chosen Freeholders, 232 N.J. 543, 181 A.3d 992, 2018 WL 1832631 (2018), this Court's most authoritative prior application of the provision arose in Resnick, 77 N.J. 88, 389 A.2d 944. Resnick involved a challenge to the East Brunswick Board of Education's adoption of a rule whereby religious groups could rent school facility space for religious worship and instruction during non-school **195 hours at the same rates as charged to other secular community groups. Id. at 93-95, 98, 389 A.2d 944. We invalidated the Board's rule, holding that Article I, Paragraph 3 of the State Constitution"prohibits any lease arrangement between a school board and religious groups under which the out-of-pocket expenses of the board directly attributable to the use by the religious body are not fully reimbursed." Id. at 103, 389 A.2d 944.
In explaining that holding, reached in the setting of religious organizations conducting worship services and religious instruction on rented public property subsidized by the public fisc, the Court in *940 Resnick stated that the State Constitution is explicit and requires "that religious organizations be singled out among nonprofit groups in general as being ineligible for certain benefits which are partly subsidized by tax-generated funds." Id. at 103-04, 389 A.2d 944.[3] A workaround to that constitutional problem was recognized in Resnick, however; the Court stated that the "constitutional infirmity may be remedied by an upward adjustment of rentals to religious groups which would fully cover extra utility, heating, administrative and janitorial costs which result from the leasing by these groups." Id. at 103, 389 A.2d 944.
Resnick's broad summary language about religious organizations should not be misconstrued. To be viewed properly, the Court's statements in Resnick must be tethered to its holding, and its holding rooted the application of Article I, Paragraph 3 of the State Constitution to the facts of the case. Specifically, Resnick's holding allowed a church-a "religious organization"-to rent **196 public facilities for temporary worship and for the provision of religious instruction, just as other community organizations were permitted to rent such public space under the Board's policy. But, the decision made clear that such organizations must completely pay their own way for the rental use of public property so that there was no public subsidizing of the use of school facilities for religious worship or instruction. In sum, religious organizations were not excluded from a public benefit under Resnick, but a religious organization such as a church, renting public space to enable it to minister to its flock through worship or religious instruction, was required to pay the entire freight for its use of the public facility.
B.
The issue decided in Resnick is not the same as the question presently before us. Here, we are not concerned with the Yeshiva's and the Seminary's use of public space for worship or religious instruction purposes. Rather, here we confront the direct disbursement of grant funds for the improvement of physical and technological infrastructure of higher education facilities, a general and statewide benevolent program to which two entities seek to gain access like other higher education institutions.
Specifically at issue is whether the disbursement of funds for avowed secular purposes becomes violative of our Religious Aid Clause when granted to sectarian schools that offer curricula steeped in theological study, as plaintiffs say. According to plaintiffs, giving public grant funds to two educational institutions so pervasively sectarian and oriented to the training of persons for instructing in a particular religion constitutes religious use prohibited under the Religious Aid Clause.
Plaintiffs argue that the grants "would directly support and enhance the grantees' religious training and instruction." They assert that the grants to the Yeshiva *941 would support construction of classrooms, libraries, and other facilities that would be used for religious instruction." Quoting directly from application records, **197 plaintiffs note that the Yeshiva's "grants would 'significantly increase the capacity of' the Yeshiva's religious 'academic programs,' " and that "the grants to the Seminary would be 'essential to' and 'multiply the impact of' 'the Seminary's educational mission' of 'preparation of men and women for theological leadership.' They would pay for technological training and equipment that would enhance religious study through aids such as 'biblical software programs.' "
The educational institutions assert that the improvements to the infrastructure of their facilities would assist adherents to their faith and earnest students alike. Both claim they are not training for ordination and therefore would not be using funds for the "maintenance of any minister or ministry." Further, the Seminary emphasizes that the grant funds for improving its library's IT infrastructure will allow for public access to the Seminary's library materials, which include scholarly articles and books, although the record contains few specifics on the contents of the theological library. When questioned about the contents at argument, counsel's proffer was general in nature. The Yeshiva also claims that greater public access to its library materials will be a beneficial by product of the grants.
In light of the contrary assertions by the parties and the state of this record, we can only conclude that the facts are murky on critical details that will affect the constitutional conclusions to be reached. Different religions use varying approaches to what constitutes religious instruction and forms of worship. There are many questions left unanswered by this record, which does not explore or define the relationship of religious instruction and study to worship, devotion to the religion, and ministry at these two institutions. Also, greater detail is needed concerning the exact purpose and ultimate use to which the grant funds will be put. The record simply does not equip us to answer whether the award of the challenged grant funds to these two institutions violates the Religious Aid Clause of the State Constitution.
**198 IV.
A.
In assessing the Religious Aid Clause issue that was reached by the Appellate Division, there is a corollary question concerning whether the denial of the requested funds would run afoul of the federal Free Exercise Clause. U.S. Const. amend. I. Although not raised in plaintiffs' complaint, the issue about the Free Exercise Clause has been raised by the State, the educational institutions, and amicus. The Free Exercise argument advanced before our Court was not addressed below. Upon close examination of two Supreme Court cases highly relevant to the argument involving the federal Free Exercise Clause, we again find that the inadequacies and unresolved questions about the present record hobble any ability to address the question at this time.
In Locke v. Davey, the United States Supreme Court addressed the constitutionality under the Free Exercise Clause of a scholarship program established by the State of Washington that excluded otherwise eligible students who were pursuing degrees in theology. 540 U.S. 712, 715-17, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004). The Court began by noting that the Free Exercise Clause and Establishment Clause are often in tension with each other, but that there is also " 'room for play in the joints' between them." Id. at 718, 124 S.Ct. 1307 (quoting *942 Walz v. Tax Comm'n of N.Y.C., 397 U.S. 664, 669, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) ). The Court then explained that Washington's state constitution "has been authoritatively interpreted as prohibiting even indirectly funding religious instruction that will prepare students for the ministry." Id. at 719, 90 S.Ct. 1409. Thus, Washington's constitution "draws a more stringent line than that drawn by the United States Constitution." Id. at 722, 90 S.Ct. 1409. The question was therefore whether the scholarship program violated the Free Exercise Clause. Id. at 719, 90 S.Ct. 1409.
The Court examined Washington's scholarship program, noting that "[t]he program permits students to attend pervasively religious **199 schools, so long as they are accredited," and that students were "still eligible to take devotional theology courses." Id. at 724-25, 90 S.Ct. 1409. The Court therefore held:
[W]e find neither in the history or text of Article I, § 11 of the Washington Constitution, nor in the operation of the [State of Washington's] Scholarship Program, anything that suggests animus towards religion. Given the historic and substantial state interest at issue, we therefore cannot conclude that the denial of funding for vocational religious instruction alone is inherently constitutionally suspect.
Without a presumption of unconstitutionality, Davey's claim must fail. The State's interest in not funding the pursuit of devotional degrees is substantial and the exclusion of such funding places a relatively minor burden on [scholarship recipients]. If any room exists between the two Religion Clauses, it must be here. We need not venture further into this difficult area in order to uphold the ... Scholarship Program as currently operated by the State of Washington.
[ Id. at 725, 90 S.Ct. 1409.]
Locke was distinguished by the Supreme Court's recent decision in Trinity Lutheran Church of Columbia, Inc. v. Comer, 582 U.S. ----, 137 S.Ct. 2012, 198 L.Ed.2d 551 (2017). We scrutinized that case in Freedom From Religion Foundation, 232 N.J. 543, 181 A.3d 992, in our determination of whether historical trust grants provided for the repair of churches with active congregations violated the Religious Aid Clause of our State Constitution. In Freedom From Religion Foundation, we noted that Footnote 3 of the Court's opinion, in which four Justices joined, appeared to create a distinction between religious identity and religious use, and that the Court explained in that footnote that it was "not address[ing] religious uses of funding or other forms of discrimination." Id. at 571, 181 A.3d 992 (quoting Trinity Lutheran, 137 S.Ct. at 2024 n.3 ). Moreover, Chief Justice Roberts's majority opinion explained that the difference between the facts at issue in Trinity Lutheran and the facts of Locke was that the scholarship recipient in Locke"was not denied a scholarship because of who he was; he was denied a scholarship because of what he proposed to do-use the funds to prepare for the ministry." Trinity Lutheran, 137 S.Ct. at 2023.
Our task in this matter will eventually require an assessment of whether the grant distributions to the Yeshiva and to the Seminary **200 are more like the program at issue in Locke or more like the one at issue in Trinity Lutheran, and of how the Religious Aid Clause's prohibition against "maintenance of any minister or ministry" comports with that assessment.
At present, we are ill-equipped to answer those questions based on the uncertainties in the factual record. Because resolution of those factual matters is a necessary basis for the additional claims, this matter similarly requires factual development *943 prior to undertaking any analysis of the state Establishment Clause, Donation Clause, and LAD claims raised in the complaint and which are, as yet, undecided.
With respect to the Religious Aid Clause issue-the only claim of plaintiffs' to be decided by the Appellate Division, whose judgment is under review-we see only one appropriate course of action. Rather than address a matter of constitutional importance on an insufficiently developed record, the better course is to remand the matter for an evidentiary hearing to bring the relevant factual material into better focus. Among the questions to be explored are those previously identified based on the contrary views of the parties concerning (1) the sectarian nature of these institutions of higher education; (2) whether, in the setting of the curriculum and training programs of these particular institutions, the grant funds will necessarily be used in the "maintenance of any minister or ministry"; and (3) the adequacy of promised restrictions, or other curbs, against sectarian use of the grant proceeds at present and into the future.
B.
This case comes before us under Rule 2:2-3(a)(2) as an appeal from final agency action. An action that comes to us as a result of final agency action must have a fully developed record so that a reviewing court may engage in meaningful appellate review. See, e.g., In re Issuance of Permit by DEP, 120 N.J. 164, 173, 576 A.2d 784 (1990) (explaining that reviewing court "has no capacity to review [administrative action] at all unless there is some kind of **201 reasonable factual record developed by the administrative agency" (quoting State v. Atley, 157 N.J. Super. 157, 163, 384 A.2d 851 (App. Div. 1978) ) ). Where the agency record is insufficient, we may order a remand to the agency to more fully develop the record. See R. 2:5-5(b) ("At any time during the pendency of an appeal from a state administrative agency, if it appears that evidence unadduced in the proceedings below may be material to the issues on appeal, the appellate court, on its own motion or on the motion of any party, may order, on such terms as it deems appropriate, that the record on appeal be supplemented by the taking of additional evidence and the making of findings of fact thereon by the agency below ...."); see also, Noble Oil Co. v. DEP, 123 N.J. 474, 475, 588 A.2d 822 (1991) (holding that administrative record was inadequate for review and remanding to agency to supplement record). We conclude that this is a case requiring such action.
The record does not reveal enough about the nature of the educational training and curriculum offered by the Yeshiva and Seminary and how it is delivered, nor does the record present sufficient detail about how the grant fund projects will be put to use in the institutions' respective settings. It is imperative that those issues be more fully developed below, through the crucible of an adversarial process, before the constitutional questions raised in this matter are addressed. Accordingly, we will remand to the Secretary for the development of a record in accordance with this opinion.
V.
The judgment of the Appellate Division is necessarily vacated, and the matter is remanded to the Secretary for proceedings consistent with this opinion. We leave in place the Consent Order entered by the trial court.
JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON and TIMPONE join in this opinion. CHIEF JUSTICE RABNER did not participate.

The third grant, for $289,889, would have subsidized the renovation of a conference room and upgrades to the room's telecommunications equipment, but the Seminary subsequently withdrew that application.

The ACLU-NJ has taken the lead in pursuing this matter. Therefore, we hereinafter refer to plaintiffs collectively as ACLU-NJ.

The requirement was not to be "carried to an extreme," the Court noted. Id. at 103, 389 A.2d 944 (noting specifically exception for police and fire protection for property held by sectarian groups). Police and fire protection was considered different from the rental question posed in Resnick.Ibid. So too is busing of pupils to school considered part of general public benefits that do not transgress constitutional limits on aid to religion. See Everson v. Bd. of Educ. of Ewing, 133 N.J.L. 350, 355-56, 44 A.2d 333 (1945), aff'd, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (holding that government reimbursement of busing costs incurred by parents of students who attended parochial schools did not contravene the State or Federal Constitutions).