**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0525-18T4

NEW JERSEY OUTDOOR
ALLIANCE, SAFARI CLUB
INTERNATIONAL, and
SPORTSMEN'S ALLIANCE
FOUNDATION,

     Appellants,

v.

NEW JERSEY DEPARTMENT
OF ENVIRONMENTAL PROTECTION,
and CATHERINE R. McCABE,
Commissioner of the New Jersey
Department of Environmental Protection,
in her official capacity,

     Respondents.

_____

Argued telephonically November 7, 2018 – Decided November 16, 2018

Before Judges Sabatino, Haas and Mitterhoff.

On appeal from the New Jersey Department of Environmental Protection.

James H. Lister (Birch Horton Bittner & Cherot) of the Alaska and District of Columbia bars, admitted pro hac

vice, argued the cause for appellants (Law Offices of John C. Lane, Van Dalen Brower, LLC, and James H. Lister, attorneys; Peter Caccamo-Bobchin and John M. Van Dalen, of counsel and on the joint brief; Anna M. Seidman, of the District of Columbia bar, admitted pro hac vice, Douglas S. Burdin, of the District of Columbia bar, admitted pro hac vice, and James H. Lister, on the joint brief).

Jung W. Kim, Deputy Attorney General, argued the cause for respondents (Gurbir S. Grewal, Attorney General, attorney; Jason W. Rockwell, Assistant Attorney General, of counsel; Jung W. Kim, on the brief).

Doris K. Lin argued the cause for amicus curiae Animal Protection League of New Jersey.

PER CURIAM

This accelerated appeal represents the latest chapter of the recurring controversy over the hunting of black bears in New Jersey.

The present case involves the executive branch's closure of State lands[1] to the bear hunt. Currently, bear hunts are conducted in accordance with the 2015 Comprehensive Black Bear Management Policy ("CBBMP"). The first phase of the 2018 hunt was completed in early October and the second phase is scheduled to begin very soon on December 3.

---

[1] For simplicity, we use the term "State lands" to refer more precisely to the particular lands designated in the administrative order that has been challenged in this appeal.

For the reasons that follow, we deny appellants' emergent request to invalidate and enjoin the closure of State lands for the hunt's second phase. We reject appellants' contention that the closure requires the adoption of regulatory rules, because, as settled precedent has held, a closure such as this involves the State's proprietary interests and not the State's role as a regulator. We also reject appellants' claim that the closure must be halted in this private civil action because of federal law.

Nevertheless, we remand this matter pursuant to Rule 2:5-5(b) for the development of a suitable plenary record and fact-finding in the Office of Administrative Law ("OAL"). That neutral quasi-judicial forum shall address the hotly-disputed and fact-dependent claims that the closure is arbitrary and capricious, conflicts with the scientific underpinnings of the CBBMP, and imperils public safety. In the meantime, we are unpersuaded appellants have met their considerable burden of demonstrating they are entitled to injunctive relief nullifying the State's restrictions on the imminent second phase of the 2018 hunt.

I.

The hunting of black bears has frequently been the subject of litigation in our courts. Several units of State Government have a role in the development

3

of plans for a seasonal bear hunt. When it occurs, the hunt typically is held in the fall before the bears hibernate for the cold weather.

Subject to the approval of the Commissioner of the Department of Environmental Protection ("DEP"), the State Fish and Game Council[2] ("Council") is empowered to "formulate comprehensive policies for the protection and propagation of fish, birds, and game animals," "for the propagation and distribution of food fish," and "for the keeping up of the supply thereof in the waters to the State." N.J.S.A. 13:1B-28. Pursuant to that delegated authority, the Council has periodically adopted a CBBMP, most recently in 2015.[3]

---

[2] The Fish and Game Council is composed of eleven members, appointed by the Governor with Senate advice and consent. N.J.S.A. 13:1B-24. The applicable statute prescribes that three members of the Council must be farmers, six must be sportsmen, one must be "knowledgeable in land use management and soil conservation practices," and one member "shall be the chair[person] of the committee established pursuant to section 7 of the 'Endangered and Nongame Species Conservation Act [N.J.S.A. 23:2A-7(e)].'" Ibid.

[3] Part B of this court has a long-pending appeal by the Animal Protection League of New Jersey ("the League") and others, challenging the validity of the 2015 CBBMP. See League of Humane Voters of N.J. v. N.J. Dep't of Envtl. Prot., No. A-4630-15 (App. Div. argued Nov. 9, 2018). That appeal was argued before Part B, as had been previously scheduled, on November 9, 2018. We instructed counsel to omit from their briefing in this accelerated appeal before Part A legal arguments concerning the validity of the 2015 CBBMP, since they are presently before Part B.

A-0525-18T4

Over the past decades, the Supreme Court and this court have issued several opinions addressing challenges to previous actions of the Commissioner and Council regarding black bear hunting. Sometimes those challenges have been mounted by animal rights groups and individuals opposed to bear hunting; at other times the litigation, as here, has been brought by sporting groups and persons who partake in or otherwise support such hunting. See, e.g., U.S. Sportsmen's All. Found. v. N.J. Dept. of Envtl. Prot., 182 N.J. 461, 476 (2005) (holding that the Council's "ability to authorize a bear hunt is subject to the statutory condition precedent of the [DEP] Commissioner's earlier approval of the very comprehensive policies governing the propagation of black bears"); Animal Prot. League of N.J. v. N.J. Dep't of Envtl. Prot., 423 N.J. Super. 549 (App. Div. 2011) (upholding the validity of the 2010 CBBMP); N.J. Animal Rights All. v. N.J. Dep't of Envtl. Prot., 396 N.J. Super. 358 (App. Div. 2007) (invalidating the 2005 CBBMP and affirming the Commissioner's subsequent failure to implement a policy); Safari Club Int'l v. N.J. Dep't of Envtl. Prot., 373 N.J. Super. 515 (App. Div. 2004) (upholding the Commissioner's order to close all lands "owned, managed or controlled" by DEP to black bear hunting).

As the result of decisions by State Government and the impact of judicial opinions, bear hunts recently have been conducted in some years and not in

others.  In 2003, the Council authorized the first bear hunt since 1970, in response to reports of bears interacting with people and property.  U.S. Sportsmen's All. Found. v. N.J. Dep't of Envtl. Prot., 372 N.J. Super. 598, 600 (App. Div. 2004).  That 2003 hunt resulted in the harvest of 328 bears.  Ibid. No hunt was conducted in 2004.  N.J.A.C. 7:25-5.6 App.  The hunt was resumed in 2005, yielding a harvest of 298.  42 N.J.R. 753(a) (Apr. 19, 2010).  No hunts took place in 2006, 2007, 2008, or 2009.  N.J.A.C. 7:25-5.6 App.  Hunts again took place in 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017, yielding fluctuating harvests for those respective years of 592, 469, 287, 253, 273, 510, 636, and 409 bears.

The current CBBMP was approved, after public notice and comment, by then-Commissioner of the DEP, Bob Martin, and adopted as an Appendix to N.J.A.C. 7:25-5.6 effective on November 16, 2015 (operative on November 21, 2015).  47 N.J.R. 2753(c) (Nov. 16, 2015).  The 2015 CBBMP expires on June 12, 2021.  Ibid.  Among other things, the 2015 amendment to the regulation prescribes the bear hunt season to consist of two six-day segments, one in October and one in December.  N.J.A.C. 7:25-5.6(a); 47 N.J.R. 929(a), 933 (May 18, 2015).  The second hunting segment was initiated to "allow for more consistent harvests, with essentially all bears available for hunting and with

fewer complications due to weather events." 47 N.J.R. at 930. The regulations also address the timing of the closure of the hunt. If the rate of harvest reaches thirty percent,[4] the hunting season concludes. N.J.A.C. 7:25-5.6(a). Conversely, if the harvest rate at the end of the December segment is below twenty percent, the hunt will be extended for an additional four consecutive days. N.J.A.C. 7:25-5.6(b). As of 2015, hunters are allowed to purchase two permits, but can only harvest one bear per bear management zone. N.J.A.C. 7:25-5.6(a)(1), (2); see 47 N.J.R. at 939. The boundaries of the hunting zones were changed in 2015, and a new zone was created. N.J.A.C. 7:25-5.6(a)(3); 47 N.J.R. at 934-35. The number of permits for sale was increased from 10,000 to 11,000, and the lottery to determine who would receive a permit was eliminated. N.J.A.C. 7:25-5.6(a)(1); 47 N.J.R. at 934.

The present litigation arises out of actions taken in August 2018 by the Executive Branch, first by the Governor and then by the DEP Commissioner, both of whom were sworn into office earlier this year.

---

[4] The harvest rate is a calculation equaling "the number of harvested bears that were tagged in the current calendar year within bear management zones (["]BMZs["]) open to hunting divided by the number of bears that were tagged in the current calendar year that are available for harvest (total number of bears tagged in the current year within BMZs open to hunting minus known mortality of such tagged bears and number of such tagged bears known to have left the BMZs that are open to hunting)." N.J.A.C. 7:25-5.6(a).

On August 20, 2018, Governor Philip D. Murphy issued Executive Order 34 ("EO 34"). Executive Order No. 34 (Aug. 20, 2018), 50 N.J.R. 2039(a) (Oct. 1, 2018). The Executive Order declares:

> WHEREAS, New Jersey is home to abundant and diverse wildlife, including many threatened and endangered species and species that are critical to the State's varied ecosystems; and
>
> WHEREAS, among those species is the American black bear (Ursus americanus), which is found primarily in the northern part of the State but has been sighted statewide; and
>
> WHEREAS, the State of New Jersey, through the Department of Environmental Protection ("DEP") and its predecessors, has long authorized hunting and trapping of certain species in New Jersey for several purposes, including recreation and wildlife management; and
>
> WHEREAS, there has been considerable debate over the last several decades as to whether New Jersey should authorize a black bear hunt; and
>
> WHEREAS, in 2010, despite considerable public outcry against a hunt, the New Jersey Fish and Game Council (the "Council) published a Comprehensive Black Bear Management Plan ("CBBMP") which recommended the reintroduction of a black bear hunt to take place every year in December; and
>
> WHEREAS, the Council also promulgated regulations through the New Jersey Game Code authorizing and setting forth the parameters of a black bear hunt to take place beginning in 2010; and

WHEREAS, a new CBBMP was finalized in 2015 that continued the recommendation to permit a black bear hunt; and

WHEREAS, as a result of the 2010 and 2015 CBBMPs and corresponding authorizations in the Game Code, a black bear hunt has been held in New Jersey for the past eight years; and

WHEREAS, the Council has refused to reconsider its authorization of a black bear hunt for 2018 despite a clear call to action by the Governor; and

WHEREAS, in light of the significant opposition to the black bear hunt and continuing debate about techniques for management of the black bear population, and in an effort to promote public safety on public lands, it is appropriate to limit the use of State lands for the black bear hunt; and

WHEREAS, the intent of this Order is to exercise the full extent of the legal authority of the Governor and the Commissioner of Environmental Protection ("Commissioner") to limit the black bear hunt in order to promote the public safety and welfare while protecting important wildlife; and

WHEREAS, the authority over the black bear hunt rests with the Council and several court decisions have made it clear that neither the Governor nor the Commissioner have the authority to unilaterally alter or cancel the black bear hunt; and

WHEREAS, while neither the Governor nor the Commissioner can unilaterally prevent a black bear hunt, the Commissioner has clear authority to direct and coordinate the use of all public lands under DEP's

9

jurisdiction, including instituting a ban on hunting on said lands;

> NOW, THEREFORE, I, PHILIP D. MURPHY, Governor of the State of New Jersey, by virtue of the authority vested in me by the Constitution and the Statutes of this State, do hereby ORDER and DIRECT:
>
> 1. The Commissioner shall take all necessary and appropriate actions within the Commissioner's authority to protect black bears on lands controlled by the State of New Jersey, including deciding whether to close said lands to the hunting of black bears pursuant to the Commissioner's authority at N.J.S.A. 13:1B-5 et seq., as clarified and confirmed in Safari Club International v. New Jersey Department of Environmental Protection, 373 N.J. Super. 515 (App. Div. 2004).
>
> 2. This Order shall take effect immediately.

[50 N.J.R. at 2039(a).]

Following the issuance of EO 34, Catherine R. McCabe, the present Commissioner of the DEP, issued on August 30, 2018 Administrative Order 2018-24 ("AO 2018-24"). AO 2018-24 states:

> WHEREAS, on August 20, 2018, Governor Murphy issued [EO 34] to exercise the full extent of the legal authority of the Governor and the Commissioner of the Department of Environmental Protection to limit the hunting of American black bear (Ursus americanus) within the State in order both to promote the public safety and welfare and protect an important wildlife species that provides an overall benefit to the citizens of this State; and

WHEREAS, EO 34 directs me, as Commissioner, to take all necessary and appropriate actions within my authority to protect black bears on lands controlled by the State of New Jersey; and

WHEREAS, N.J.S.A. 13:1B-5 authorizes me to exercise the State's propriety authority to direct and coordinate the uses of all public lands under the jurisdiction of the Department, including all State forests, parks, recreation areas, historic sites, natural areas, and wildlife management areas; and

WHEREAS, in Safari Club International v. New Jersey Department of Environmental Protection, 373 N.J. Super. 515 (App. Div. 2004), the Appellate Division affirmed the Department's authority to close all or any portion of its lands to hunting and to allow hunting of only certain species; and

WHEREAS, the exclusion of Department lands from black bear hunting will allow for the limited protection of the black bear population in New Jersey while the Department continues to focus its resources on pursuing, developing, and increasing its alternative control methods and evaluating its policies, recommendations, and regulations related to black bear management on its lands, and is in the best interest of balancing conservation, recreation, preservation, and management of these lands at this time.

NOW THEREFORE, I, Catherine R. McCabe, Commissioner, pursuant to the authority vested in me under N.J.S.A. 13:1B-5, hereby ORDER and DIRECT that all lands owned, managed or otherwise controlled by the Department, including, but not limited to, all State forests, parks, recreation areas, historic sites, natural areas, and wildlife management areas, are closed to the hunting of black bears.

11

This Order shall take effect immediately and shall continue in effect until revoked or amended in writing by me.

No one pursued any legal action during the month of September 2018 to challenge AO 2018-24. The first phase of the bear hunt went forward, as had been scheduled and publicly announced, during the week of October 8, 2018, with no bear hunting allowed on State lands. That October segment resulted in the harvest of 140 bears.

On October 4, 2018, appellants New Jersey Outdoor Alliance, Safari Club International, and the Sportsmen's Alliance Foundation filed the present appeal, challenging the validity of AO 2018-24. Shortly after filing their appeal, appellants sought a stay of the AO 2018-24 from the DEP. The DEP Commissioner denied the stay request on October 17, expressing her reasons in a detailed written decision. Appellants then sought, on October 18, to file an emergent application accelerating this appeal, desirous of obtaining an expedited judicial ruling on the validity of AO 2018-24 and the closure decision before the second phase of the 2018 hunt, which will begin on December 3. Despite the circumstance that the asserted emergency, to some extent, was self-created by appellants' own failure to take legal action or seek emergent relief sooner, we granted the application to accelerate the appeal, over the State's

objection. We did so in light of the public interest involved, and the potential benefits of providing judicial guidance before the December 3 hunt takes place. We also permitted the League, on short notice, to participate as an amicus.

This court issued an accelerated and compressed briefing schedule, and promptly heard oral argument, enabling a decision to be issued before the upcoming Thanksgiving holiday and court recess, and recognizing that one or more dissatisfied parties would likely seek immediate review of our ruling by the Supreme Court.[5] The parties have expressed a desire to receive a final decision on the merits of this appeal in advance of the December 3 hunt. That goal has been achieved by the issuance of this expedited opinion.

On appeal, appellants present the following three arguments: (1) the closure of State lands to the bear hunt is arbitrary and capricious because it is impermissibly based on a political campaign promise, contrary to science, and materially conflicts with and undermines the 2015 CBBMP; (2) AO 2018-24 comprises an administrative "rule" and must be reversed because the DEP did not first conduct public comment as prescribed by the Administrative Procedure Act ("APA"), N.J.S.A. 52:14B-4, and by Metromedia, Inc. v. Director, Division

---

[5] We express our appreciation to all counsel for their cooperative efforts and courtesies in supplying this court with helpful briefs and appendices in accordance with the expedited schedule and page limitations.

A-0525-18T4

of Taxation, 97 N.J. 313, 331-32 (1984); and (3) AO 2018-34 usurps federal law under the Pittman-Robertson Wildlife Restoration Act ("P-R Act"), 16 U.S.C. § 669-669k, which assigns such authority singularly to the DEP's Division of Fish and Wildlife ("DFW"), and arbitrarily and capriciously fails to consider the impropriety of a partial diversion of federal grant funds used for state wildlife restoration lands. We now address these three arguments, in rearranged order.

A.

We first consider appellants' claim that AO 2018-24 and its prohibition of bear hunting on State lands violates federal law, specifically the P-R Act, 16 U.S.C. § 669-669k. We readily reject that argument because appellants have no established right to bring a private cause of action against the State under this federal law.

Enacted in 1937, the P-R Act establishes a federal funding program for state wildlife restoration projects. "[T]he intent of the P-R Act is to insure that state fish and wildlife agencies spend state license fee revenues on the administration of the state fish and wildlife agencies if the state participates in P-R funding." Sportsmen's Wildlife Def. Fund v. U.S. Dep't of Interior, 40 F. Supp. 2d 1192, 1199 (D. Colo. 1999). Accordingly, "no money apportioned" by the program "to any State shall be expended therein until" the State has

14

"assented" to the provisions of the P-R Act, and has "passed laws for the conservation of wildlife which shall include a prohibition against the diversion of license fees paid by hunters for any other purpose than the administration of said State fish and game department." 16 U.S.C. § 669. In 1938, New Jersey assented to the P-R Act through a statutory enactment, and authorized wildlife restoration projects in compliance with the P-R Act. N.J.S.A. 23:12-1.

Appellants contend the promulgation of AO 2018-24 violates the P-R Act in two ways: by removing management and control away from the "designated" state agency, which appellants contend is the DFW, and by diverting lands from their intended purpose by disallowing recreational bear hunting on those lands. In support of those claims, appellants point to correspondence between the DEP and the United States Fish and Wildlife Service ("USFWS"), in which the federal agency advised the DFW to review grant documents in order to ensure federal grant moneys for wildlife restoration were not being misapplied as the result of EO 34. The State denies any such misuse, and essentially maintains that nothing in the P-R Act requires a bear hunt to proceed on the wildlife management areas. The State also argues that the DFW is an administrative agency housed within the DEP, and that it is entirely lawful for the DEP

15

Commissioner to issue an administrative order affecting the functions of one of the Department's internal units.

Even before reaching the merits of these arguments, however, we must consider a threshold procedural and jurisdictional issue: whether private parties such as appellants may compel the enforcement of the P-R Act against a State and its officials in state court litigation in which the United States Government is not a party. Stated differently, is there a private right of action under the P-R Act? Appellants fail to show such a right exists.

"The question of the existence of a statutory cause of action is, of course, one of statutory construction." Touche Ross & Co. v. Redington, 442 U.S. 560, 568 (1979) (citations omitted). In Cort v. Ash, 422 U.S. 66, 78 (1975), the United States Supreme Court set forth the following factors to be considered when determining the existence of a private cause of action to enforce a statute: (1) whether the plaintiff is part of the class Congress intended to benefit when enacting the statute; (2) whether there exists evidence of legislative intent to create or deny such a remedy; (3) whether inferring a private cause of action is consistent with the underlying purposes of the legislation; and (4) whether the cause of action is one traditionally relegated to state law.

16

In <u>Touche Ross</u>, the Supreme Court partially overruled <u>Cort</u>, holding that the four factors are not all of equal weight. 442 U.S. at 575. The Court clarified that, when determining whether a statutory scheme creates a private right of action, the central inquiry is "whether Congress intended to create, either expressly or by implication, a private cause of action." <u>Ibid.</u> The Court has since reinforced this holding – that the lodestar of the analysis is Congressional intent – on several occasions.[6]

The P-R Act contains no express provision creating a private cause of action to enforce its terms. Hence, we only need to consider whether Congress intended to create such a private cause of action under the P-R Act by implication. No such intention may be fairly inferred from the statutory scheme. If anything, the inherent structure of the statute and associated federal regulations point strongly to the contrary.

---

[6] <u>See, e.g.</u>, <u>Alexander v. Sandoval</u>, 532 U.S. 275, 286 (2001) (statutory intent is "determinative" as to the existence of a cause of action premised on a statute); <u>Suter v. Artist M.</u>, 503 U.S. 347, 364 (1992) ("The most important inquiry here . . . is whether Congress intended to create the private remedy sought by the plaintiffs."); <u>Karahalios v. Nat'l Fed'n of Fed. Emp.'s, Local 1263</u>, 489 U.S. 527, 532 (1989) (holding the "ultimate issue is whether Congress intended to create a private cause of action" (quoting <u>California v. Sierra Club</u>, 451 U.S. 287, 293 (1981))); <u>Thompson v. Thompson</u>, 484 U.S. 174, 179 (1988) ("In determining whether to infer a private cause of action from a federal statute, our focal point is Congress' intent in enacting the statute.").

A-0525-18T4

The P-R Act does not proscribe any conduct as unlawful. It does not expressly create or recognize any rights for individuals or private organizations. Rather, the regulations adopted under the P-R Act provide that a state is ineligible to receive funds if it "[f]ails materially to comply with any law, regulation, or term of a grant as it relates to acceptance and use of [P-R] funds[.]" 50 C.F.R. § 80.11(a) (2018). The regulations also provide the Director of the USFWS with discretion to declare whether a state is in "diversion" of P-R Act funds, which is defined as "any use of revenue from hunting and fishing licenses for a purpose other than administration of the State fish and wildlife agency." 50 C.F.R. §§ 80.2; 80.21 (2018).

If the Director of the USFWS withholds federal funding, a state has the opportunity to "resolve" the diversion issue in order to continue receiving federal funds. 50 C.F.R. § 80.21; Sportsmen's Wildlife Def. Fund v. Romer, 73 F. Supp. 2d 1262, 1264 (D. Colo. 1999) (noting the state's "right to cure" a diversion). The regulations contain detailed procedures and standards for how states can resolve such diversion issues. 50 C.F.R. §§ 80.22; 80.135 (2018). If the USFWS finds a state agency allowed a use of its P-R-funded property that interferes with the property's authorized purpose, the state agency has a reasonable time, up to three years, after notification of diversion status to either

restore the property or acquire replacement property. 50 C.F.R. § 80.135(f) (2018).

The fact that Congress omitted any private cause of action from the P-R Act – but created a discretionary remedy for the federal government to withhold monies for states in diversion – strongly militates against any inference that Congress intended for private individuals or organizations to enforce the P-R Act against state agencies in state court. See Sandoval, 532 U.S. at 290 ("The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."). Allowing such a private cause of action to proceed in state court would interfere with the federal enforcement mechanisms set forth in the P-R Act and its implementing regulations. That heavily weighs against appellants' claim that Congress intended to create a private cause of action.[7]

In Illinois State Rifle Association v. Illinois, 717 F. Supp. 634, 634-35 (N.D. Ill. 1989), the plaintiffs sued the State of Illinois in federal court, alleging

---

[7] See Piscitelli v. Classic Residence by Hyatt, 408 N.J. Super. 83, 104-5 (App. Div. 2009) (finding no private right of action to enforce provision of Immigration Reform and Control Act of 1986 because the statute vested the United States Attorney General with enforcement authority and did not expressly create private cause of action); Wisniewski v. Rodale, Inc., 510 F.3d 294, 305 (3d Cir. 2007) (observing that, "agency enforcement creates a strong presumption against implied private rights of action that must be overcome").

violations of the P-R Act. They challenged the alleged diversion of P-R funds to the Division of Natural Heritage, the purchase of a Frank Lloyd Wright home, and the funding of a ranch. Id. at 636. The district court recognized that the P-R Act created no express cause of action, and thus analyzed whether the statute did so impliedly. Id. at 637. The court reasoned that the P-R Act's sole statutory sanction – withholding federal funds – "strongly suggests that a nonstatutory remedy such as a private enforcement action does not exist." Id. at 638. The court therefore concluded that the P-R Act did not create a private cause of action. Ibid. The court's reasoning in Illinois State is sound.

To be sure, a private individual or organization may challenge decisions or inaction by the USFWS in federal court under the federal Administrative Procedure Act, 5 U.S.C. § 702. See, e.g., Scarborough Citizens Protecting Res. v. U.S. Fish & Wildlife Serv., 674 F.3d 97, 99 (1st Cir. 2012); Sierra Club v. U.S. Fish & Wildlife Serv., 235 F. Supp. 2d 1109, 1136 (D. Or. 2002); Sierra Club v. U.S. Fish & Wildlife Serv., 189 F. Supp. 2d 684, 691 (W.D. Mich. 2002); Sportsmen's Wildlife Def. Fund v. Romer, 29 F. Supp. 2d 1199, 1211 (D. Colo. 1998). However, appellants' reliance upon these cases brought against the USFWS is misplaced, because the decisions either expressly recognize that the P-R Act creates no private right to enforce, or fail to question that notion.

Compare <u>Sierra Club</u>, 189 F. Supp. 2d at 691, <u>with</u> <u>Sportsmen's Wildlife Def.</u> <u>Fund</u>, 29 F. Supp. 2d at 1211.

The P-R Act grants discretionary enforcement authority to the USFWS, which issues decisions reviewable under the federal APA like any other federal agency to which that statute applies. Thus, it makes sense for federal courts to review the USFWS's compliance with the P-R Act when appropriate. The federal precedents do not support the existence of a private cause of action for an individual or private organization to seek enforcement of the P-R Act in state court against a state agency.

As an alternative argument, appellants rely upon 42 U.S.C. § 1983, which provides a cause of action for the "deprivation of any rights, privileges, or immunities secured by the Constitution" of the United States and federal statutes. <u>Wilder v. Va. Hospital Assoc.</u>, 496 U.S. 498, 508 (1990). At least one federal district court has recognized that individuals may assert § 1983 claims against state officials acting in their official capacities premised upon the state officials alleged P-R Act violations. <u>Sportsmen's Wildlife Def. Fund v. U.S.</u> <u>Dep't of the Interior</u>, 949 F. Supp. 1510, 1517-19 (D. Colo. 1996). Notably, the United States Government was a party in that Colorado federal case.

Here, appellants do not assert any constitutional rights, and the present litigation was not brought pursuant to § 1983. They instead seek to enforce the technical and funding-related provisions of the P-R Act against the State in the context of an administrative appeal, a litigation neither brought by or against the United States Government. They have no such private right of action, express or implied.

Accordingly, we must deny relief to appellants under the P-R Act. The funding questions remain a matter between the State and the USFWS, which has not made a finding that the closure of State lands to bear hunting has, in fact, diverted federal grant funds.

B.

We next consider appellants' contention that the administrative order's closure of State lands for the ongoing bear hunt is procedurally invalid because that order was issued without advance public notice and comment and formal rulemaking under the APA, N.J.S.A. 52:14B-4. This argument fails because settled precedent establishes that such a closure is a proprietary, rather than a regulatory, action.

The controlling precedent is Safari Club International v. New Jersey Department of Environmental Protection, 373 N.J. Super. 515 (App. Div. 2004),

22

an opinion cited and relied upon in EO 34, AO 2018-24, and Commissioner McCabe's denial of appellants' application for an emergent stay. In Safari Club, this court upheld the DEP Commissioner's notice closing all State lands under the DEP's jurisdiction to bear hunting. Id. at 520-21. The appellants in that case, sporting organizations who wanted access to State lands for bear hunting, challenged the Commissioner's action. Id. at 517. They argued the Commissioner "lacks the statutory authority to close [State] lands under his control to bear hunting." Ibid. They further argued that the Commissioner's action was arbitrary and capricious. Ibid. This court, in a scholarly opinion by Judge Skillman, rejected these arguments and affirmed the Commissioner's closure decision. Id. at 520-21.

As Judge Skillman explained in Safari Club, the Legislature has delegated "proprietary authority over" State lands to the Commissioner. Id. at 519. As such, "while the [Fish and Game] Council has authority to determine whether the territorial limits of a hunt will include State lands under the DEP's jurisdiction, the Commissioner has ultimate authority to determine whether to open those lands to hunting." Ibid. This "proprietary authority" is "the proprietary authority of any private or public landowner to determine whether to allow hunting on its land." Ibid. As Judge Skillman noted, that proprietary

authority over State lands circumscribes the Council's regulatory functions with respect to hunting rules and regulations. Id. at 520.

In particular, N.J.S.A. 13:1B-5(a) declares "the [DEP] [C]ommissioner shall have authority to direct and coordinate the uses of all public lands under the jurisdiction of the department." Other statutory provisions recognize the Commissioner's ability to control State lands. For example, N.J.S.A. 13:1B-15.101(a) states that "[t]he [D]ivision [of Parks and Forestry] shall, under the direction and supervision of the [C]ommissioner: (a) [d]evelop, improve, protect, manage and administer all State forests, State parks, State recreation areas, State historic sites, and State natural areas, excepting those regulated by interstate compact." (emphasis added). In addition, multiple portions of the DEP's regulations recognize the State's proprietary authority over State lands. See, e.g., N.J.A.C. 7:2-2.2, -2.3, and -2.18. For instance, N.J.A.C. 7:2-2.18 prescribes that "[a] person shall not hunt, fish and/or trap, except on specifically designated lands and waters of the State Park Service." Further, N.J.A.C. 7:25-2.26 provides:

> Nothing contained in N.J.A.C. 7:25-2 shall preclude the Division from limiting, or closing from, public use any specific land and water areas under its control, effective immediately upon making the finding that prevailing conditions warrant such restriction to protect the users, or to protect and preserve the land and water areas, or

both, and continuing for so long as such conditions warrant.

[(Emphasis added).]

Safari Club makes clear that a Commissioner's authority to close State lands to bear hunting is fundamentally a proprietary decision, and not a regulatory action. The opinion does not state or suggest that a Commissioner must engage in administrative rulemaking in making such a proprietary determination.

As an important caveat, Safari Club does caution that "[t]he Commissioner's exercise of his [or her] authority to control the uses of State parks, forests and recreation areas, like any other authority delegated to an administrative official, may not be exercised arbitrarily or capriciously." 373 N.J. Super. at 521. Hence, "if it could be shown that bears pose a serious threat to public safety and that hunting on [S]tate lands must be allowed to combat this threat, the Commissioner's closure of [S]tate lands to bear hunting could be found to be arbitrary and capricious." Ibid. Judge Skillman noted the appellants in Safari Club "have not undertaken to demonstrate that there is any public safety or other vital public interest that requires State lands to be open to bear hunting." Ibid. (emphasis added). Based on the record, the panel unanimously concluded that the appellants had not met their burden to show that the Commissioner's

notice closing all lands owned, managed or controlled by the DEP to bear hunting was either arbitrary or capricious.[8] Ibid.

The logic of Judge Skillman's analysis – classifying as proprietary in nature a decision to close State lands to bear hunting – exempts the DEP from conducting formal rulemaking procedures under the APA as a precondition of the State exercising its rights over those lands as a property owner. Therefore, AO 2018-24 is not an "administrative rule" that must be enacted through the elaborate procedures for agencies to adopt regulations spelled out in the APA. See N.J.S.A. 52:14B-2 (defining an "administrative rule").

If we were to adopt appellants' contrary argument, the State conceivably would need to pursue formal rulemaking, including public notice and comment, whenever it chose to make periodic decisions to close portions of State lands for repairs, renovations, maintenance, or public safety reasons. We recognize that, in a general sense, the State in such circumstances is arguably "regulating" what persons may do or not do on State lands, but that aspect must yield to the dominant inherent proprietary nature of the Commissioner's actions. Accordingly, the requirements of the APA and the multi-factor analysis under

---

[8] We address, infra, in Part II(C) of this opinion, the present appellants' arguments that the current closure of State lands to bear hunting is arbitrary and capricious.

<u>Metromedia</u>, 97 N.J. at 331-32, used for generally determining when formal rules are required for an agency's regulatory actions, have no bearing on this case.[9]

Nor would formal rulemaking be necessary if, hypothetically, the State chose in the future to reopen some or all of State lands to bear hunting. The State has the flexibility and prerogative to make that decision, so long as it is not shown to be arbitrary or capricious.[10]

Appellants stress that in <u>Humane Society of the United States, New Jersey Branch, Inc. v. Guido</u>, 173 N.J. Super. 223, 233 (App. Div. 1980), an opinion this court issued twenty-four years before <u>Safari Club</u>, the panel instructed that, in the future, public notice-and-comment procedures should be followed (although without specifying that administrative rules were necessary) before

---

[9] Appellants' counsel have advised us that they have ascertained that the briefs in the <u>Safari Club</u> appeal from 2004 did not contain any arguments about an alleged need for APA rulemaking or the <u>Metromedia</u> standards. Although we appreciate counsel's diligence, their research is inconsequential because of the analytic force of the court's "proprietary authority" holding in <u>Safari Club</u>. The State is acting as a landowner, not as a regulator, when it decides to open or close State lands to certain hunting activities.

[10] Even if rulemaking were legally required, the Executive Branch would still have residual powers to bypass the usual APA procedures upon a gubernatorial declaration of emergency under the Civilian Defense and Disaster Control Act, N.J.S.A. App. A:9-30 to -63, or via emergency rulemaking under N.J.S.A. 52:14B-4(c), neither of which was invoked here.

the State takes action similar to that taken in <u>Guido</u>, namely implementing a one-day deer hunt in a state park. The panel in <u>Guido</u> observed that the DFW Director's action opening the park to hunters for one-day deer hunt "may not fit precisely into the statutory definition of an 'administrative rule,'" because it was not generally applicable or of continuing effect. <u>Ibid.</u> However, the court noted the one-day hunt was a departure from longstanding policy or practice prohibiting hunting in High Point Park, and "had the potential to change in a substantial way, at least temporarily, the use and enjoyment of the park by the general public." <u>Id.</u> at 233-34.

We recognize why appellants have cited <u>Guido</u>, but find that opinion is not dispositive under current law. This court's supervening opinion in <u>Safari Club</u> adopted a proprietary authority principle that now controls the legal analysis. To be sure, nothing prevents the Commissioner, as a matter of public administration and public relations, from choosing to hold public hearings or to invite public notice and written comment before closing or opening portions of State lands to bear hunting.[11] But that option is not mandated by the now-

---

[11] We recall in this regard Judge Stern's observations in <u>N.J. Animal Rights Alliance</u>, 396 N.J. Super. at 372-73 n.3, that "Bear management is a topic that sparks widespread disagreement and strong public sentiments. The need to give the public sufficient notice of the terms of a proposed bear management policy,

controlling precedent of Safari Club classifying such decisions as proprietary rather than regulatory.

We therefore reject appellants' procedural argument that AO 2018-24 must be declared invalid for lack of rulemaking.

## C.

We lastly turn to appellants' contention that AO 2018-24 is arbitrary and capricious, and, therefore, the DEP Commissioner's decision, even if it is deemed proprietary, must be nullified and consequently we should direct the DEP to allow the December segment of the bear hunt to take place on State lands.

In approaching this issue, we reiterate the admonition of Safari Club, namely that "[t]he Commissioner's exercise of his [or her] authority to control the uses of State parks, forests and recreation uses, like any other authority delegated to an administrative official, may not be exercised arbitrarily or capriciously." Id. at 521. As we have already noted, Judge Skillman mentioned examples in Safari Club of what might demonstrate such arbitrary and capricious

---

and to respond fully to comments received from citizen objectors and advocates alike, is particularly salient here." Those perceptive comments, however, were made in the context of a case involving the validity of a CBBMP as a regulatory document, and not the distinguishable context of the State's proprietary closure decision that is challenged in the present appeal.

State action, such as proof "that bears pose a serious threat to public safety and that hunting on [S]tate lands must be allowed to combat this threat," or that "there is any public safety or other vital public interest that requires State lands to be open to bear hunting." Ibid.

Appellants claim they have demonstrated such a showing of a "vital public interest" requiring the resumption of a seasonal bear hunt on State lands. They assert the DEP lacks empirical or other evidential support for AO 2018-24, and the closure conflicts with the underpinnings of the 2015 CBBMP. Appellants further argue the closure was ordered solely for political reasons in order to fulfill a campaign promise. The DEP and the amicus disagree. They argue in opposition that AO 2018-24 is not arbitrary or capricious, but instead is a reasonable exercise of the State's proprietary authority over State lands.

As we evaluate these contentions, we must abide by general principles governing the standards of appellate review of decisions by administrative agencies. We recognize the "final determination of an administrative agency . . . is entitled to substantial deference." In re Eastwick Coll. LPN–to RN Bridge Program, 225 N.J. 533, 541 (2016). "A strong presumption of reasonableness must be accorded [to an] agency's exercise of its statutorily delegated duties." In re Certificate of Need Granted to the Harborage, 300 N.J. Super. 363, 380

(App. Div. 1997). Generally, our courts will not overturn an administrative action "unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." J.B. v. N.J. State Parole Bd., 229 N.J. 21, 43 (2017) (quoting In re Herrmann, 192 N.J. 19, 27-28 (2007)). "The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the [party] challenging the administrative action." Lavezzi v. State, 219 N.J. 163, 171 (2014) (alteration in original) (quoting In re J.S., 431 N.J. Super. 321, 329 (App. Div. 2013)).

In their effort to prove that the closure order is arbitrary and capricious, appellants particularly emphasize a January 4, 2018 status report from the DFW addressing the implementation of the 2015 CBBMP.[12] In its final passage, the status report concludes as follows:

> DFW's active, integrated bear management strategy is effective and essential for maintaining bears at a density that provides for a sustainable population within suitable bear habitat, minimizes human-bear conflicts and reduces emigration of bears to unsuitable habitat in suburban and urban areas. The black bear population in New Jersey is beginning to stabilize at a level that DFW believes is consistent with the cultural

---

[12] At oral argument, the State's counsel indicated that she is unaware of the genesis of the status report, and whether, for example, it was a report scheduled for issuance under some policy or routine procedure. In any event, the status report preceded the new administration taking office, and we presume it may have been generated in part to be informative for the incoming Commissioner.

A-0525-18T4

carrying capacity for this species in the state. No one management tool is responsible for the successes demonstrated by implementing the CBBMP. Continued management using all the tools provided in the CBBMP is critical to maximize public safety, minimize bear-related damages, and maintain a healthy black bear population. Without continuation of population management by regulated sport hunting, NJ's black bear population will double in five years.

Appellants argue that AO 2018-24 conflicts with the January 2018 status report's findings about the continued need to include seasonal bear hunting as one of the vital "tools" in managing the bear population in this State. They point out that, over the past several years, about forty percent of the bears harvested in the fall hunt were encountered on State lands. They argue that disallowing the hunt on such a substantial portion of State lands materially undermines the integrated plan set forth in the 2015 CBBMP, and that there is no evidence in the record that would justify such a territorial limitation. Appellants also note that the harvest from the first phase of this year's hunt in October 2018 declined by 43% from the October 2017 first phase.

In response, the State and amicus contend that the closure order represents a reasonable exercise of the Commissioner's proprietary authority over State lands. They dispute that appellants have demonstrated that the current population of black bears in New Jersey "pose[s] a serious threat to public safety

32

and that hunting on [S]tate lands must be allowed to combat this threat[.]" <u>Safari Club</u>, 373 N.J. Super. at 521. The State and amicus also dispute that, despite the alleged inconvenience and loss of recreational opportunity to persons who would like to hunt on State lands, appellants have not shown, and cannot prove, that "public safety or other vital public interest[s] . . . require State lands to be open to bear hunting." <u>Ibid.</u>

Among other things, the State asserts the drop in the October 2018 harvest as compared with the October 2017 figure may be accounted for by many variables other than the closure order, such as weather and the number of bears and hunters with permits. The record shows the harvest rate figures have tended to be inherently volatile from year to year. The State further emphasizes that hunters with licenses are not precluded by AO 2018-24 from hunting on the large tracts of private lands and other properties not owned or controlled by the State. In addition, the State points out that the December 2018 segment of the hunt may be extended by several days if harvest goals are not met.

We have duly considered appellants' arguments, and the competing contentions of the State and the amicus. Our review is impeded by the circumstance that there is no well-developed factual record by which we can

make an informed ultimate plenary determination as to whether the closure of State lands to the hunt is arbitrary and capricious.

The record supplied to us is not definitive in several respects. The parties and amicus dispute a number of fact-laden matters. The fact that about 40% of the bears in past harvests were apprehended on State lands does not necessarily mean that figure will translate into a 40% drop-off of the final 2018 harvest, given the mobility of bears, as well as the mobility of hunters, who may prefer to hunt on State lands, but might still seek out bears on other properties. The empirical impact of the closure on the black bear population is debatable and unclear, as no past hunts took place with that major restriction. Further, to the extent the closure order depends on the probative value of scientific findings and expert opinion, we lack any credibility determinations or fact-finding by a neutral tribunal.

Rule 2:5-5(b) authorizes a method for developing a suitable record in such circumstances. It provides:

> At any time during the pendency of an appeal from a state administrative agency, if it appears that evidence unadduced in the proceedings below may be material to the issues on appeal, the appellate court, on its own motion or on the motion of any party, may order, on such terms as it deems appropriate, that the record on appeal be supplemented by the taking of additional evidence and the making of findings of fact thereon by

34

the agency below or, in exceptional instances, by a judge of the Superior Court especially designated for that purpose.

[R. 2:5-5(b).]

Through the mechanism of this Rule, our appellate courts "retain[] the discretion, in an appropriate case . . . to refer [a contested agency action] to the Law Division or to the agency for such additional fact-finding as it deems necessary to a just outcome." Infinity Broad. Corp. v. N.J. Meadowlands Comm'n, 187 N.J. 212, 227 (2006).

Notably, the Supreme Court invoked Rule 2:5-5(b) earlier this year in American Civil Liberties Union of New Jersey v. Hendricks, 233 N.J. 181, 185 (2018), a case involving a challenge to a final decision of the State Secretary of Higher Education ("Secretary"). In American Civil Liberties Union of New Jersey, the Supreme Court concluded that "[a] remand is necessary to allow for the development of a proper record, with fact-finding" as "[a]dversarial testing of the evidence in support of the parties' presentations is required here." Ibid. As the Court noted, "[i]t is imperative that [the] issues be more fully developed below, through the crucible of an adversarial process . . . ." Ibid. Accordingly, the Court remanded the case to the Secretary so that a "contested case proceeding" could be conducted. Ibid.; see also In re Mountain Ridge State

35

Bank, 244 N.J. Super. 115, 118-19 (App. Div. 1990) (remanding an appeal under

R. 2:5-5(b) to the Commissioner of Banking and directing that there be a hearing

in the OAL).

In like manner, we choose to remand this matter to the Commissioner with

instructions that there be a contested case proceeding before the OAL, in order

to develop the record and address the hotly-disputed, fact-laden disputes over

whether AO 2018-24 has reasonable evidential support and is not arbitrary and

capricious.  R. 2:5-5(b).  At such a quasi-judicial hearing, an Administrative

Law Judge ("ALJ") can hear the testimony of competing fact and expert

witnesses, and make appropriate credibility assessments and findings of fact.

The pertinent data, and the scientific reliability of that data, including the most

recent data from the October and December phases of the 2018 hunt, could be

analyzed and dissected in that forum through the adversarial process.  See In re

Accutane Litig., 234 N.J. 340, 382 (2018) (underscoring the importance in civil

matters of relying on scientific evidence that is shown to be reliable).[13]  The

_____

[13] We cite In re Accutane Litigation for illustrative purposes only, and do not rule that the Supreme Court's holdings concerning the admissibility of scientific evidence under N.J.R.E. 702 govern the admissibility in administrative litigation, where the Rules of Evidence are relaxed.  Rather, we mention In re Accutane Litigation solely with regard to weighing the probative value of scientific or expert opinions, such as, for example, affording greater weight to

parties could also present empirical evidence as to whether the omission of State lands from the hunt substantially undercuts the efficacy of the CBBMP.

The case shall not be litigated in the OAL on summary decision, but rather by the presentment of testimonial and documentary proof, "through the crucible of an adversarial process," Am. Civil Liberties Union of N.J., 233 N.J. at 201. The parties are free, of course, to stipulate to any uncontested facts.

After an ALJ renders his or her written decision on remand, any aggrieved party may file exceptions with the Commissioner. We do not presume in advance which party or parties maybe dissatisfied with the ALJ's findings. Upon receipt of those findings, the Commissioner shall issue a final agency decision, with the benefit of those findings.

That said, the Commissioner is free at any time to revise, modify, or rescind AO 2018-24, as she may find appropriate in the public interest and consistent with the law and the State's proprietary authority over State lands, provided her decision is not arbitrary and capricious and has adequate support. For instance, the data generated from the October 2018 and December 2018 hunts, as compared with past hunts, may provide an independent basis for the

---

peer-reviewed scientific literature over studies that are not peer-reviewed. See 234 N.J. at 398-99.

Commissioner to decide to extend, modify, or rescind AO 2018-24. We do not wish the pendency of OAL proceedings to hinder the Commissioner's flexibility in responding to new data and additional information and experience.

Following the Commissioner's final decision, a new appeal may be pursued in this court. Again, we do not presume which party or parties will be dissatisfied with the outcome. The key point is that the parties and the public would all have more than the scant and rather inconclusive record that presently exists.

In remanding this case pursuant to Rule 2:5-5(b), we by no means suggest that we do so as a matter of routine. Administrative appeals still will be suitable for appellate review without an OAL proceeding. Nor should our remand be construed to suggest the State must undertake the burden of defending its day-to-day proprietary decisions in the OAL. We respect the constitutional prerogatives of the Executive Branch, and do not intend to foist an undue burden on the routine workings of government.[14] The present case is distinctive from

---

[14] As a side point, we note there is nothing nefarious or illegal about a new administration taking authorized executive actions to attain policy objectives that were the subject of a political campaign, so long as those decisions otherwise comport with the law and are not arbitrary and capricious. Hence, even if EO 34 and AO 2018-24 implement public policies concerning bear hunting that are consistent with positions taken during a political campaign, that

said routine contexts in the likely material impact that the closure of hundreds of thousands of acres of State lands may have on the scientific and policy underpinnings of the CBBMP.

We now turn to the time-sensitive question of whether, as appellants request, we should immediately nullify AO 2018-24 and order that State lands must be available for the upcoming December phase of the hunt. This request to nullify, or at least stay, the administrative order implicates the standards for injunctive relief. Similar if not identical considerations pertain, whether we view appellants' demands for relief under the standards for a preliminary injunction under Crowe v. De Goia, 90 N.J. 126 (1982), or for a permanent injunction.

As to preliminary injunctive relief under Crowe, courts must consider these well-known factors: (1) if an injunction is "necessary to prevent irreparable harm"; (2) if "the legal right underlying [the appellants'] claim is unsettled"; (3) if the appellants have made "a preliminary showing of a reasonable probability of success on the merits"; (4) "the relative hardship to the parties in granting or denying [injunctive] relief." Id. at 132-34.

---

provides no per se basis to set them aside. The voters in our democracy ultimately decide if legally-permissible policy choices advocated by a candidate should cause an electoral change.

In <u>Rinaldo v. RLR Investment, LLC</u>, 387 N.J. Super. 387, 397 (App. Div. 2006), we distinguished the analysis of a preliminary injunction under <u>Crowe</u> from the analysis of a permanent injunction, stating:

> [T]he determination whether to grant a permanent injunction at the conclusion of the case does not involve a prediction as to the outcome of future proceedings. Instead, at that stage of the case, the court must make findings of fact based on the evidence presented at trial and then <u>determine whether the applicant has established the liability of the other party, the need for injunctive relief, and the appropriateness of such relief on a balancing of equities</u>.
>
> [(Emphasis added) (citations omitted).]

Having duly considered these factors, we conclude that appellants have not demonstrated that either preliminary or final injunctive relief is warranted, pending the outcome of the administrative remand.

The merit (or even the probability of success) of appellants' claim of public necessity for a hunt to take place on State lands has yet to be established. As the State and amicus rightly emphasize, bear hunters will still have access under AO 2018-24 to other lands, and the hunt may be extended if the harvest falls below the specified targets. The modest fee expended for a hunting license, and the temporary loss of access to State lands for recreational bear hunting, do not sufficiently comprise irreparable and imminent harm. Appellants' delay in

not appealing AO 2018-24 until over a month after it was issued, and in not seeking emergent relief until after the October phase of the hunt had already occurred, weakens their claim that it is imperative to open the hunt to State lands.

Appellants also have not met their burden of demonstrating that the public interest mandates the immediate nullification of AO 2018-24, or that the balance of equities tips in their favor. We therefore deny their emergent application for an injunction; subject of course to whatever the Supreme Court may instruct if further appellate review is sought.

Affirmed in part as to appellants' federal and rulemaking claims, and remanded in part as to their claim of arbitrary and capricious decision-making. We deny the requested stay of AO 2018-24. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION